Per Curiam :
This case was referred pursuant to Rule 45 to W. Ney Evans, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed March 16,1960. Briefs were filed by both parties, exceptions to the commissioner’s findings was filed by the plaintiff, and the case was submitted to the court on oral argument by counsel. Since, after full consideration of the record, the court is in agreement with the findings and recommendations of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover and its petition will be dismissed.
It is so ordered.
OPINION OR COMMISSIONER
The contract in suit, for the rehabilitation of 24.3 miles of track of The Alaska Railroad, was performed by plaintiff to the satisfaction of the contracting officer. Plaintiff now seeks recovery for breach of the contract by defendant.
*46 All of tbe evidence in tbe case was received at a pretrial conference.[1] It consists of (1) tbe official report of proceedings before the Board of Contract Appeals of tbe Department of tbe Interior; [2] (2) the exhibits received by tbe Board in that proceeding; and (3) tbe recommendations of tbe Board’s examiner and the decision of tbe Board.
Since tbe contract’s disputes clause contained tbe standard provision according finality to administrative decisions of “any dispute concerning a question of fact,” the threshold problem here is whether or not any of plaintiff’s disputes with tbe contracting officer was so predicated as to remove it from tbe question-of-fact category.[3]
The first of plaintiff’s claims relates to the bid item under which the contractor was to “raise, line, and dress track.”
The contract required that “ballast to make an average 6" raise (1,770 cubic yards per mile) will be spread to make two separate track lifts * * and that, “as an over all lift of six (6") inches is required, the first raise should be approximately four inches (4") although considerable variation from this rule must be allowed to eliminate sags and humps in the existing grade line.”
Plaintiff says that, in preparing its bid, it read these specifications to mean (1) that the track had to be lifted twice, for an overall raise of 6 inches, and (2) that ballast averaging 6 inches had to be placed, but not in two lifts on new ballast. The contracting officer required plaintiff to make two lifts on new ballast.
*47 Since plaintiff had already made one lift, while it was replacing and respacing ties, before the new ballast (to be supplied by the Railroad) was available, plaintiff contends the contracting officer in effect required an overall raise of 9 or 10 inches, in three raises, and that the third raise was extra work for which the contractor should receive an equitable adjustment.
In this connection plaintiff relies on the line of cases typified by Peter Kiewit Sons Co. v. United States,[4] wherein the court said:
* * * Where the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted. * * *
The Board of Contract Appeals ruled, in effect, that the specifications were not susceptible of the construction urged by plaintiff.
Was this a dispute concerning a question of fact, within the meaning of the disputes clause ?
In Martin Wunderlich et al. v. Uriited States,[5] the court said No, referring to “the unanimity of statement by courts that questions of the interpretation of written documents were‘questions of law’ * *
Wwnderlieh was reversed.[6] The Supreme Court upheld the finality of the administrative decisions under the disputes clause in the absence of conscious wrongdoing.[7]
The so-called Wunderlich statute followed.[8] Section 2 of the act provided:
No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.
*48 Considering the history of the Wunderlich Act, and the provisions of section 1,[9] the foregoing provisions of section 2 must be deemed to place “question of law” in juxtaposition to “question of fact” within the meaning of the discussion of such juxtaposition in the Wwnderlich decision of the Court of Claims.
The Court of Claims opinion in Wwnderlich noted that:
* * * questions of the interpretation of written documents are not, speaking with analytical accuracy, in most cases questions of law in the sense that a lawyer or judge has the special skill needed to answer them. They may be questions of agriculture, or engineering, or ¿nance, or. medicine, or law. In the division of judicial functions between the judge and the lay jury which only by accident would have the requisite skill in a particular case, the judge reserved this function to himself, presumably as being more competent than the jury. And judges and lawyers began to call the questions “questions of law,” as a short way of saying that they should be decided by the judge. * * *
In the instant case, the question, in plaintiff’s first claim, is whether or not the specifications were reasonably susceptible of the interpretation which plaintiff says it placed upon them in the preparation of its bid. As between judge and jury, it might be for the jury to say whether or not plaintiff did, in fact, make the interpretation, or do so at the time it alleges. But surely it would be for the judge to say, at the outset, whether or not such an interpretation could reasonably have been made. If he thought not, there would be no question for the jury.
My conclusion, therefore, is that plaintiff’s claim for extra track lifting arose out of a dispute concerning a question of law. Consequently, the decision by the Board of Contract Appeals was not “final and conclusive,” wherefore plaintiff *49 is entitled to a review of the claim in the instant proceeding. Associated Traders, Inc. v. United States, 144 Ct. Cl. 744, 169 F. Supp. 502.
Plaintiff’s second claim relates to the quantity of new ballast for which it was entitled to be paid.
A total of 1,227 cars of new ballast was loaded, hauled, and placed. The contracting officer credited plaintiff with 51,510 cubic yards because the specifications recited a capacity of 42 cubic yards per car.[10] While the contract was under way, plaintiff challenged the accuracy of the specifications’ capacity listing, and adduced evidence tending to show that each car, as loaded, contained at least 48 cubic yards. On this basis, the pay quantity was 58,872 cubic yards.[11]
Although plaintiff requested the contracting officer to compute the pay quantities at the higher figure, he refused to do so, and plaintiff duly appealed his decision. The Board of Contract Appeals reversed the contracting officer’s ruling. It sustained the finding by its examiner that the average carload contained 48 rather than 42 cubic yards, ruled that plaintiff was entitled to payment “for loading, hauling, and spreading * * * 58,872 cubic yards * * *” of ballast, and directed the contracting officer to take appropriate action for the allowance of additional compensation in the amount of $7,362 (for 7,362 additional cubic yards at the unit price of $1).
Inasmuch as defendant does not now contest the ruling of the Board of Contract Appeals on the overage of 7,362 cubic yards hauled and spread, no question remains concerning this facet of the claim.[12]
*50 Plaintiff’s third claim challenges the determination of $7,862 as being the limit of compensation dne to it for the extra ballast.
The bid item for “load, haul, and place ballast” called for 43,011 cubic yards. The placement of 58,872 cubic yards represented an increase of more than 36 percent above the bid item quantity. Paragraph 14 of the General Eequire-ments of the specifications provided as follows:
INCREASED OR DECREASED QUANTITIES OK WORK — The Government reserves the right to make such alterations in the plans or in the quantities of the work as may be considered necessary or desirable, and no conditions or provisions of the contract shall be thereby voided or evaded; provided, that all alterations shall be ordered in writing. The Engineer shall have the authority to order changes in plans and construction. When alterations involve an increase of more than twenty-five percent (25%) or decrease of more than twenty-five percent (25%) and less than one hundred percent (100%) of any bid item as shown in the original proposal quantities are ordered, either the Contractor or the Government may request an adjustment of the unit bid price and a supplemental agreement setting forth the adjustment shall be executed by the Contractor and the Government; except that a supplemental agreement shall not be made for any item which is underrun one hundred percent (100%). In the event that unit bid items are increased or decreased more than twenty-five percent (25%) no allowance shall be made for anticipated profits or loss due to such changes. The Contractor shall perform the work as increased or decreased.
Plaintiff asked the contracting officer for an adjustment in the unit price applicable to the entire 58,872 cubic yards of ballast loaded, hauled, and placed. The contracting officer refused. Plaintiff appealed. The Board of Contract Appeals sustained the contracting officer and denied the claim for an adjustment.
The first question here, as in the claim for extra track lifting, is whether or not the dispute out of which the claim arose concerned a question of fact or a question of law.
No details are in evidence as to the submission to or consideration by the contracting officer of the claim for an ad *51 justment. The examiner who heard the testimony for the Board analyzed the claim (and recommended against it) in terms of “the interpretation of the readjustment clause” for which he understood the contractor was contending.[13] The Board said that it shared “the opinion of the examiner that the appellant has failed to prove that it is entitled to an increase in the unit price on account of such overrun,” and added that “* * * it would certainly be necessary for the appellant to establish * * * that its costs for loading, hauling and placing ballast, together with a reasonable allowance for profit on this work, exceeded * * *” the unit bid price. The Board’s specific conclusion was that:
The evidence offered is * * * insufficient to admit of an informed judgment as to the existence of this essential fact, and, hence, there is no basis for an increase in the unit price.
It is clear that the Board’s rejection of plaintiff’s claim for an adjustment, although specifically based upon a failure of proof, was predicated upon the Board’s interpretation of the pertinent provisions of the contract; and that this interpretation was undertaken to ascertain the intent of the parties. Independent examination of the contract provisions indicates that such a review was requisite to a determination of the dispute. I conclude, therefore, that the dispute concerned a question of law. It follows that plaintiff’s claim for an adjustment is properly before this court.
On the merits of the adjustment claim, defendant points (1) to the wording of GR-14, reserving the right to the Government “to make such alterations in the * * * quantities of the work as may be considered necessary or desirable” subject to the proviso that “all alterations shall be ordered in writing”; and (2) to the fact that no alterations were ordered in writing. It was only when alterations involved an increase or decrease of more than 25 percent that an adjustment could have been requested.
*52 Unfortunately, tlie record is barren of details concerning actions or discussions at the contracting officer’s level[14] which might shed light on the contractor’s efforts, if any, to gain recognition of the increased volume of ballast as an alteration. If the contractor sought such recognition from the contracting officer and was refused, the failure of the contracting officer to make an order in writing would not foreclose plaintiff.
Assuming that plaintiff was not foreclosed by the absence of an order in writing recognizing the increased volume as an alteration, the fact remains that plaintiff has done no better here than it did before the Board in establishing a reason for an adjustment.
The writer agrees with the Board of Contract Appeals that, before an adjustment would be in order, it would be necessary for the contractor to show that its costs for loading, or hauling, or placing the ballast, together with a reasonable allowance for profit, exceeded the unit bid price. I would add a requirement that such an increase in cost be shown to have resulted from or was attendant upon the increase in volume.[15]
As stated in finding 21(a), the evidence is insufficient to show that the use by plaintiff of a power shovel to load the ballast, in lieu of the conveyor belt equipment it had contemplated using, resulted in any increase in the cost of loading the ballast.[16]
*53 There is no evidence to suggest that any increase was incurred in the unit cost of hauling ballast.[17]
If an increase was incurred in the unit cost of ballast, such increase was incurred in the placing of ballast,[18] but plaintiff has advanced no such claim in this proceeding.
In support of its claim for extra track lifting, plaintiff contends that the approval by the contracting officer of its revised construction progress chart (showing that work on the bid item of “raise, line, and dress track” would begin nearly a month before the new ballast would be available) was tantamount to agreement by the contracting officer that one of the two required lifts could be made before placing new ballast. This contention falls before the contracting officer’s advice, in writing, when he approved the progress chart, that:
* * * All work shall be in accordance with the specifications and subject to the availability of materials as provided by the specifications.
As heretofore noted, plaintiff relies, for the foundation of this claim, upon the specifications being susceptible of the construction given to them by plaintiff, viz, that, while the track had to be lifted twice, for an overall raise of 6 inches, and while ballast had to be spread for an average depth of 6 inches, the contract did not call for two lifts on new ballast, as required by the contracting officer.
The contracting officer’s requirement came as a surprise to plaintiff. When first apprised of it, plaintiff’s superintendent asked defendant’s project engineer to show him any such wording in the specifications.[19] The superintendent stood his ground with the contracting officer.[20] Thereafter, the president of plaintiff corporation expounded his thesis in great detail, reviewing various provisions of the contract and the logic of the sequences of work.[21] Similar arguments have *54 been advanced vigorously by plaintiff’s attorney, before the Board of Contract Appeals and in his brief to the commissioner of this court.
The vigor and sincerity of plaintiff’s advocacy lend credence to the point of acceptance that plaintiff did place upon the specifications the construction it says it did. Vigor and sincerity alone, however, do not suffice to establish the reasonableness of the construction upon which plaintiff acted.
Careful reading of the pertinent provisions of the specifications [22] has convinced the writer that they were not reasonably susceptible of the construction given to them by the contractor. The opening condition of Bid Item No. 4 (“raise, line, and dress track”) was that “ballast to make an average 6" raise (1,770 cubic yards per mile) will be spread to make two separate track lifts * * The word “spread” implies new ballast, and the specification of 1,770 cubic yards per mile implies a depth of at least 6 inches on the average, per mile.
The inference to be drawn from the contractor’s construction is that its emphasis was placed upon the later reference to “an over all lift of six (6") inches,” whereby the depth of new ballast along the whole track (not per mile) would average 6 inches. Considering the ironing out of sags and humps, where the depth of ballast would be greater or less than 6 inches, with the concomitant emphasis upon sags rather than humps,[23] the average depth of ballast along the track where there were no sizable sags or humps would be less than 6 inches: enough less to permit the placing of all required new ballast at one lift at all points except where sags requiring greater depth might call for more than one lift.
Any such rationalization as the foregoing leaves out of account the specification of 1,770 cubic yards per mile, which was of the essence of the ballast requirement. The bid quantity of 43,011 cubic yards of new ballast reflected merely the computation of 1,770 cubic yards per mile over 24.3 miles.
*55 As indicated in the findings the specification of 1,770 cubic yards of ballast per mile may indicate that the Railroad failed to give adequate notice of what its requirements would be for sag raising and bank widening.[24] The letter of August 6, 1956, from plaintiff to the Secretary of the Interior,[25] as well as the overrun of 36 percent in the amount of ballast used, tends to support the inference that the Railroad was remiss in this particular. Plaintiff, however, has not complained here of such a fault, if fault there was.
FINDINGS OF FACT
1. (a) On June 15, 1955, The Alaska Railroad[1] issued an invitation for bids for the rehabilitation of 24.3 miles of track between Portage and Indian, Alaska.
(b) The specifications were attached to the invitation for bids. Among the General Requirements of the specifications was the following:[2]
* * * unit price bids are required as follows:

2. (a) The bids were opened on July 15, 1955, as scheduled. Plaintiff[3] was the low bidder, having bid, in terms of unit prices and total amount, as follows:

*56 (b) Formal notice of award of the contract was postponed until September 14, 1955, because of the Railroad’s inability to furnish the crushed ballast, which it was to supply. Its estimate at that time was that the ballast would be available by July 15, 1956. Award of the contract was accordingly offered to plaintiff and accepted by it for performance of the work during the 1956 season.
3. The contract[4] was executed on September 23,1955, calling for “Ballasting, etc. of approximately 23.4 miles of Main Line Track * * * and 0.9 miles of sidings, all in accordance with the plans and specifications * * *” for the consideration of $261,950.30.
4. The contract contained the following General Provisions :
1. DEFINITIONS
(a) The term “head of the department” as used herein shall mean the head or any assistant head of the executive department or independent establishment involved, and the term “his duly authorized representative” shall mean any person authorized to act for him other than the Contracting Officer.
(b) The term “Contracting Officer” as used herein, shall include his duly appointed successor or his authorized representative.
3. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor, for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as pro- *57 Tided in Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed.
Clause 6. disputes :
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall furnish to the Contractor a written copy of his decision. Such decision shall be final and conclusive unless within 30 days from the date of receipt thereof, the Contractor appeals therefrom by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary. The decision of the Secretary or his duly authorized representatives upon such appeal shall be final and conclusive unless the decision is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. In connection with any appeal proceeding under the “Disputes” clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
5. The section of the specifications devoted to Construction Details contained the following provisions:
BID ITEM NO. 1-LOAD, HAUL AND PLACE BALLAST — All ballast material shall be loaded from Railroad’s stock pile of crushed ballast at Spencer pit, hauled and unloaded by the Contractor by dumping as the means provided by the Railroad or the Contractor permits.
(a) As the ballast material is being unloaded from center and side dump cars, one or more cars shall be opened at a time, allowing the required amount of ballast to flow out as the train is moved along slowly to provide the desired amount of material to be distributed as evenly as possible. The unloaded material shall be leveled down by means of a Jordan plow or spreader. Care must be taken not to disturb alignment markers, stakes or interfere with through traffic. Ballast car doors shall be “buckled up” as soon as they are clear of the dump and not hauled “open” as they are likely to foul on track crossing planks and switch lead rails.
*58 (b) The Contractor will be paid at his bid price per cubic yard, measured in the loaded car at the pit site. He will provide his own dumpmen. The Alaska Railroad will rent to him one Jordan spreader with an Alaska Railroad operator as outlined in Paragraph GR — 38.
bid item NO. 2 — ties Respace — The Contractor will be paid for respacing ties according to stated requirements thereof at his bid price per track foot and in accordance with the following requirements:
(a) Main line ties will be spaced 22 ties per 39 foot panel of 115 lb. rail and 18 ties to each 33 foot panel of 70 lb. rail on siding or spur tracks. All main line ties must be laid at right angles to the rails and spaced approximately 21%" center to center^ letting the rail joints fall where they may. Where light 70 lb. rail is used on siding tracks, ties must be spaced 22" center to center and 18 to each 33 ft. rail panel. Pay footage for this spacing work on sidings is measured from heel of frog to heel of frog. Girdwood 2,035 feet. Bird 2,665 feet. Payment will be made at main line bid price per track foot for this siding work.
*****
bid item No. 3 — ties plaoe — The Contractor will place or replace new creosoted ties in the track (main line or sidings) at his bid price for each tie replaced or placed according to the following requirements and provisions:
(a) Ties shall be replaced with new ones where present ties are marked for removal by the Engineer or his representative and in accordance to The Alaska Railroad’s specifications and standards. All ties whether they are renewals, new lays or additions on either main line or siding tracks are included in this Bid Item No. 3. Ties placed by the Contractor on pit tracks or work spurs for his own use are excepted.
*****
BID ITEM NO. 4-RAISE, LINE AND DRESS TRACK — The Contractor will raise, line and dress track at his bid price per track foot subject to the following conditions:
(a) Ballast to make an average 6" raise (1,770 cubic yards per mile) will be spread to make two separate track lifts between the north end of Bridge 647T and the south end of Bridge 88.1 (23.4 miles).
Ballast will also be spread to make two separate track lifts on Girdwood and Bird passing tracks. Kern siding will not be rehabilitated. The Contractor will be *59 paid for this siding work at the same rate per track foot as his main line bid price. Pay measurements for raise, line and dress on siding work will be from switch point to switch point, main line measurements. Girdwood siding 2,227 feet. Bird siding 2,857 feet.
(b) Where engineer top of rail stakes are not set the track will be raised to elevations obtained by “spot-board” methods. The Contractor’s track foreman will set the spot-board to a height and at a location approved by the Railroad’s inspector or Engineer. As an over all lift of six (6") inches is required, the first raise should be approximately four inches (4") although considerable variation from this rule must be allowed to eliminate sags and humps in the existing grade line.
(c) Ballast shall be packed or tamped with pick, shovel, tamping bar or tamping machine (tamping machine preferred) as directed from a point fifteen inches (15") inside of each rail on both sides of the ties to the end of same, tamping the outside section of tie first “cross tamping” is not permitted. All tamping must be subject to the approval of the Engineer or his representative.
(d) Stakes or lining points will be set for the center line of track by the Engineer and the track lined to same after the initial four inch (4") raise, but a lining gang shall follow one or two days behind the finished lift and spot up and line places found not to be holding up under traffic. The Contractor will use rail lining instruments when lining long stretches of tangent track.
(e) The Contractor shall trim the ballast to conform to the existing roadbed section, or as directed by the Engineer.
*{» *}•
(j) Measurements for payment footages on sidings for tie spacing only shall commence at heel of frog and end at heel of frog, main line measurements. Pay measurements for raise, line and dress will be from switch point to switch point. Bridge lengths are excluded from main line pay measurements except on ballast top structures or where the rails require spike lining the unit bid price per track foot will be allowed.
6. The section of the specifications devoted to General Requirements contained the following provisions:
GR-i CONTRACTING offioer — Wherever the term “Contracting Officer” or “Engineer” is used in this specification, it refers to the Chief Engineer of The Alaska Railroad, Anchorage, *60 Alaska, wbo is authorized to enter into contracts on behalf of The Alaska Railroad, subject to the approval thereof by the General Manager or the Acting General Manager, to prepare all drawings, approve or reject tests and samples as listed herein; and to act as Contracting Officer within the meaning of the provisions of any contract entered into on a United States standard form.
❖ * * * ❖
GR-3 PROJECT ENGINEER — The Chief Engineer of The Alaska Railroad may designate a Project Engineer, or Engineers, who will be detailed by The Alaska Railroad to inspect the work under this contract and represent the Contracting Officer.
gr-4 EXPLANATION to bidders — No oral interpretations will be made to bidders as to the meaning of the drawings and specifications. Requests for such interpretations should be made in writing, addressed to the Chief Engineer, The Alaska Railroad. Any interpretations made to bidders will be in the form of an addendum to the specifications or drawings. After awarding of the contract, the work will be performed under the supervision of the Contracting Officer or his duly designated Assistant or Assistants.
gr-5 scope op worn- — The work under the contract shall consist of the furnishing of all materials, equipment, tools, all labor, and all supplies and incidentals, except as otherwise listed or specified herein, for the loading, hauling and spreading of approximately 41,418 cubic yards of crushed gravel ballast on 28.4 miles of main line track between Portage, and Indian, together with the spacing of existing cross ties and regaging rails, plus the placing or replacing approximately 340 additional cross ties per mile. Also for raising, lining and dressing of track on the same section or line, together with incidental work as provided expressly or inferentially in the specifications and similar related documents made part of this contract. Passing tracks at Girdwood and Bird, totaling 0.9 miles, must also be rehabilitated and are included in this contract.
*61 GR-7 TIME OF COMPLETION—
‡ ‡ ‡
(b) Delays in work caused by the inability of The Alaska Eailroad to furnish materials as listed in these specifications to allow the Contractor to economically prosecute the work shall not be charged against the Contractor. An extension in time only will be granted to the Contractor in settlement of claims for delay in delivery of material to be furnished by the Government if, in the opinion of the Engineer, such delays did occur during the prosecution of the contract. Such extension in time, if any, shall be at the discretion of the Engineer and shall not be more than the actual time between the date of receipt of written notice and the date of delivery of the material, less two (2) weeks, as provided by Paragraph GE-9, page 10, of these specifications. Claims, if any, made by the Contractor for other delays beyond his control shall be subject to Clause 5 of Contract.
gr-8 GOVERNMENT WORK AND materials — The Government will furnish the required crushed ballast in stock piles at Spencer pit, M.P. 55.5, at the daily rate of 1,000 cubic yards per day from August 1, 1955, until the completion of requirements. The Government will also furnish and deliver on cars or on the grorrnd at the nearest station or siding not specifically exempted elsewhere in these specifications the required ties, tie plates, track spikes, rail anchors and any other necessary track materials not specifically referred to in other sections of the specifications.
gr-9 requests Eon MATERIAL- — All Contractor’s requests for material furnished by The Alaska Eailroad shall be in writing addressed to the Engineer at least two (2) weeks prior to the required date of delivery. The Contractor shall list the specific items requested and shall schedule his requests so as not to interfere with normal train movements nor cause a shortage of cars. All materials delivered to the Contractor on cars shall be unloaded and released by him within seven (7) days after date of delivery at the nearest station not specifically exempted elsewhere in these specifications. A *62 penalty of twenty dollars ($20.00) per day, per car will be charged on all cars under load, beginning on the eighth day after delivery and charge will continue until cars are released by the Contractor.
jj« * sf: ❖
GR-14 INCREASED OR DECREASED QUANTITIES OF WORK-— The Government reserves the right to make such alterations in the plans or m the quantities of the work as may be considered necessary or desirable, and no conditions or provisions of the contract shall be thereby voided or evaded; provided, that all alterations shall be ordered in writing. The Engineer shall have the authority to order changes in plans and construction. When alterations involve an increase of more than twenty-five percent (25%) or decrease of more than twenty-five percent (25%) and less than one hundred percent (100%) of any bid item as shown in the original proposal quantities are ordered, either the Contractor or the Government may request an adjustment of the unit bid price and a supplemental agreement setting forth the adjustment shall be executed by the Contractor and the Government; except that a supplemental agreement shall not be made for any item which is underrun one hundred percent (100 %). In the event that unit bid items are increased or decreased more than twenty-five percent (25%) no allowance shall be made for anticipated profits or loss due to such changes. The Contractor shall perform the work as increased or decreased.
GR-15 extra work — Work made necessary by alteration of plans or by other reasons or additional work necessary to complete the proposed improvement, for which work no price or compensation is provided in the contract, shall be deemed extra work. Such work shall be performed by the Contractor under the direction of the Engineer in accordance with the specifications. Extra work shall not be started until the Engineer has authorized the Contractor in writing to do such work, and the Contractor shall be reimbursed for such extra work as follows:
*63 (a) The Government will pay the Contractor for the actual labor, Workmen’s Compensation, Workmen’s Insurance and Taxes, plus fifteen percent (15%).
(b) The Government will pay equipment rentals on any machines used by the Contractor on such extra work at the rates suggested by the Equipment Dealers Association
(c) Materials used on such extra work will be paid for on receipted invoice, cost plus ten percent (10%).
(d) The Government shall not pay for, nor shall they be held liable for, any extra work performed in the absence of, or prior to, a written authorization or order by the Engineer to the Contractor covering such extra work.
GR-16 coNtrol of the work — Authority of the Engineer: All work shall be done under the direct supervision of the Engineer and his authorized assistants. The Engineer shall decide any and all questions which may arise as to the quality and acceptability of the materials furnished and work performed and as to the manner of performance and rate of progress of the work,. and shall decide all questions which may arise as to the interpretation of the plans relating to the work and of the specifications, and all questions as to the acceptable fulfillment of the terms of contract on the part of the Contractor, and such decision shall be final and conclusive.
GR-17 omitted details — The Contractor is to understand that any work not specifically mentioned in the specifications, but which is necessary either directly or indirectly for the proper carrying out of the intent thereof, shall be required and applied, and he shall perform all such work just as if it were particularly delineated and described. Unless specifically mentioned above, all work shall conform to the standards and customary requirements of the Government as interpreted by the Engineer.
*64 GR-20 ahthoRity AND dhtees of INSPECTORS — Inspectors, employed by the Government, will be authorized to inspect all work done, and materials furnished. Such inspection may extend to all or any part of the work and to the preparation or manufacture of the materials to be used; but such inspection shall not relieve the Contractor from any obligation to perform all of the work strictly, in accordance with the requirements of the specifications. In case of any dispute arising between the Contractor and the Inspector as to materials furnished or the maimer of performing the work, the Inspector shall have the authority to reject materials or suspend prosecution of the particular work affected until the questions at issue can be referred to and decided by the Engineer.
The Inspector shall not be authorized to revoke, alter, enlarge or relax any requirements of these specifications, nor to finally approve or accept any portion of work, nor to issue instructions contrary to the plans and specifications. Any advice inconsistent with the requirements of the plans, specifications or contract, which the Inspector may give to the Contractor, shall in no wise be construed as binding the Engineer or the Government in any way, nor releasing the Contractor from the fulfillment of the terms of the contract. The Inspector shall not be authorized to act as Foreman for the Contractor, nor to interfere with the management of the work.
H* H* * ❖ H*
GR-21 CONSTRUCTION STAKES — The Engineer will furnish and set construction stakes establishing line only and will furnish the Contractor with all necessary information, relating to line and superelevations. Track raising shall be done in two lifts to spot board elevations only. Spot board to be set by Contractor’s Foremen and approved by Government Inspector. The Contractor shall furnish, free of charge, all templates and other materials necessary for establishing and maintaining points and lines given. The Contractor shall line the track in accordance with the Engineer’s stakes and marks, and shall be charged with full respon *65 sibility for conformity and agreement of the work with such stakes and marks. The Contractor shall be held responsible for the preservation of all stakes and marks and, if, in the opinion of the Engineer, any of the alignment, stakes or superelevation marks have been carelessly or willfully destroyed or disturbed by the Contractor, the cost of replacing them shall be charged against the Contractor, and shall be deducted from the payment for the work.
GR-22 progress SCHEDULE — Within two (2) weeks after the award of contract, the Contractor shall submit to the Engineer for approval a schedule showing his proposed progress, work layout, locations, etc., of various phases of the work.
* * * * *
GR-36 BALLAST AND OTHER WORK TRAIN CARS — The following work cars will be made available and rented to the Contractor at the stated rates, per calendar day:
24 only side & center dump, Class 7100 to 7199 (42 Cu. Yds.) at $1.15
The Contractor shall make written requests to the Engineer or his representative for the number and class of ballast cars he plans to use; at least one (1) week in advance of his requirements. He shall also give an estimate of the period he intends to use them. The Eailroad will deliver such required cars to the Contractor at mutually agreed locations. Kental will commence on the date of delivery and continue for each calendar day until the cars so rented are returned to the Eailroad. The Contractor must plan his work car requirements so that short periods of release or non-use are eliminated. No shorter release period than ten (10) days, unless by mutual arrangement between the Engineer and Contractor, will be considered or allowed. The Contractor will reimburse the Eailroad for all work done by Alaska Eailroad personnel (plus material used) on the repair and maintenance of all ballast cars during their period of use by the Contractor. Cars assigned to the Contractor should be jointly surveyed before and after use.
*66 7. (a) On April 5, 1956, plaintiff’s superintendent[5] forwarded (from plaintiff’s home office in Kansas City, Kansas) to the contracting officer (in Anchorage) the contractor’s construction progress chart,[6] and requested the contracting officer’s approval of it.
(b) The chart indicated the following:
(1) On May 15, 1956, plaintiff would begin the work under bid item 4, described in the chart as “Raise, Line, & Dress Track.” This work would be continued until June 17, at which time it would be interrupted, subject to resumption on July 21 and completion on September 16.
(2) On June 11, 1956, the respacing of ties would begin, to be carried through to completion on July 22. The replacing of ties was to be started on June 17 (6 days after the work of respacing had begun) and was to be finished along with the respacing, on July 22.
(8) On June 18,1956, plaintiff was to begin to load, haul, and place ballast, continuing without interruption until completion of the ballast work on or about August 10.
(c) On April 18, 1956, the contracting officer acknowledged receipt of the construction progress chart and inquired of plaintiff’s superintendent:
The chart indicated that you propose to begin work on Raise, Line, & Dress Track on May 15. Also, that this work will proceed until June 11 before any other work is contemplated. May we have an explanation of just what work you intend to do between May 15 and June 11 on Raise, Line, & Dress Track.
(d) On April 17, 1956, plaintiff’s superintendent (writing before he received the foregoing letter) advised the contracting officer:
* * * this progress chart indicates our beginning the work on 15 May 1956. The work which we will do involves the initial raising and the lining of the track.
We would appreciate it if line stakes are in place in the proposed center line of track from Portage north an appreciable distance on 15 May 1956 and are completely in place by 15 June 1956. * * * there are a *67 great many curves in this area and * * * the field engineering work will take longer than usual * * *.
(e) On April 18, 1956, plaintiff’s superintendent received the contracting officer’s letter of April 13, and replied:
* * * We * * * will be in Anchorage April 30th, at which time I will * * * discuss the matter with you.
(f) There is no explanation in the evidence (other than the letter quoted in subparagraph (d) of this finding) of what specific work the contractor contemplated doing between May 15 and June 11,1956.[7]
8. (a) In Anchorage, plaintiff’s superintendent was referred by the contracting officer to an engineer who served as defendant’s project engineer[8] for discussions of the work. Arrangements were made for availability of ties, and the superintendent advised the contracting officer, by letter dated May 1, 1956, that operations would commence “around the 15th of May * * The letter added:
* * * it is requested at this time that the ties in the track that are to be replaced be marked for removal * * * ahead of our tie unloading crew which will start the distribution work on May 15 * * *.
(b) On May 15, 1956, the contracting officer advised plaintiff’s superintendent that the necessary ties were available and that “ties to be removed are presently being marked by a representative of the Eailroad.”
9- (a) On May 11, 1956, plaintiff’s superintendent submitted to the contracting officer for approval a revised construction progress chart.
(b) The revised chart indicated the following:
(1) May 21: the work of replacing ties would begin.
(2) May 28: the respacing of ties would begin, as would also the work of “raise, line and dress track.”
(3) June 23: loading, hauling, and placing of ballast would begin.
*68 (4) July 28: tie work (replacing and respacing) would be completed.
(5) August 14: loading, hauling, and placing ballast would be completed.
(6) September 10: the work of raising, lining, and dressing of track would be finished, thereby completing the contract.
(c) On May 12, 1956, plaintiff’s superintendent sent to plaintiff’s president a copy of the revised chart, with the following advice:
* * * I am in a * * * discussion with the railroad regarding the number of raises that we are to give the track * * *. They * * * want six inches of crushed ballast beneath the track and following our proposed schedule the raise and tie renewal and tie spacing would not constitute a first raise or if we just raised the track on existing ballast without any tie work would not be recognized by them as a first raise. In their way of thinking we will have to make three raises; one for tie spacing, one 4 inch raise, on crushed rock, and one 2 inch raise on crushed rock. I have asked [the project engineer] to show me any such wording in the specifications * * *.
(d) On May 14, 1956, the superintendent added to the foregoing:
* * * In a conversation this date * * [the project engineer] * * * agreed that the six inch raise was all that was required * * * and he * * * stated that he did not care how the work was done as long as they got a full six inch raise; however, the specifications are clear enough so there should not be any further argument regarding this matter.[9]
(e) On May 16,1956, the contracting officer approved the revised progress chart, subject to the following conditions:
* * * The track shall not be left skeletonized at any time. Sufficient ballast material must be left to hold the ties, line and grade.
* * * All work shall be in accordance with the specifications and subject to the availability of materials as provided by the specifications.
*69 10. Operations were begun on May 21, 1956. The first work undertaken was the respacing and replacing of ties.
The method used in this tie work consisted of an “out-of-face lift” of the track to free the ties[10] from the existing ballast.[11] Ties to be replaced were then removed and new ties placed. Other ties were respaced. Existing ballast material was next tamped under the ties,[12] then around them, to avoid skeletonizing the track. No new ballast was placed.
11. (a) On June 22,1956, plaintiff’s superintendent wrote the contractor:
* * * please assign * * * 24 side and center dump ballast cars in the 7100 class (42 cu. yds.) * * * for use in the ballasting operations * * *. Eental of the cars will commence June 25 * * * * *
(b) On June 22, 1956, the contracting officer wrote plaintiff’s superintendent:
* * * You may * * * proceed with your ballasting program * * *.
* * * Work train has been ordered to leave Anchorage
* * * June 25, pick up 10 ballast cars in the Portage Yard and 10 * * * in the Portage Storage Yard. You *70 will also use * * * 4 cars presently being used by [another contractor].
(c) The first loading of ballast (10 cars) was on June 27. The first spread of ballast was made on June 28.
12. (a) The tie work had been substantially completed by July 2, 1956. On that day, the contracting officer, in a conversation with plaintiff’s superintendent, advised that he would not recognize such lifting of the track as had been done[13] as one of the two raises required by the contract; that the specifications required two raises of the track aggregating 6 inches on new ballast.
(b) On July 3, 1956, plaintiff’s superintendent wrote the contracting officer:
* * * it is our contention that we are making a first raise of the track with the tie spacing work and, therefore, the track will require one more additional raise. * * * the specifications do not state that the track will be given a four * * * inch raise and then a second raise of a firm two * * * inches. The contract specifications state only that an over all lift of six * * * inches is required and that the first raise should be approximately four * * * inches.
We are agreeable to making the second raise a maximum of five * * * inches or any height under five * * * inches that you may desire, but we do not believe a third raise is our contractual obligation under the terms of the contract. * * *
(c) On July 6,1956, the contracting officer replied:
* * * Paragraph CD-4 of the specifications states specifically that sufficient ballast to make an average six inch * * * raise will be spread to make two separate track lifts. Further, that the first raise shall be approximately four inches * * * although considerable variation from this rail [sic] must be allowed to eliminate sags and humps in the existing grade line. This is interpreted to mean that the contractor is required to make a separate finish ballast lift of approximately two inches * * *.[14]
*71 * * * [No] ballast was hauled and spread before making the tie raise, and therefore this cannot be considered as being the first lift. * * *
(d) On July 10, 1956, all of the tie work was completed. Meanwhile, since June 28, a light spread of ballast had been made, to support the ties in place and thereby to protect the tie spacing and rail lining that had been done. Thereafter, heavier spreads of ballast were begun in the areas where sags were to be eliminated.[15]
13. (a) On July 12, 1956, plaintiff’s president wrote to the contracting officer:
I think a general review of the matter will substantiate the following:
a. At the time the work was started on this contract, there was no government ballast material available for this work.
b. The specifications state: “Ballast to make a six inch (6") raise will be spread to make two separate track lifts.” We do not believe that this determines the time that the ballast shall be spread. We believe that this determines that sufficient ballast will be spread to provide material for the total average 6" raise.
c. The Specifications state: “Where engineer top of rail stakes are not set the track will be raised to elevations obtained by “spot-board” methods. The Contractor’s track foreman will set the spot-board to a height and at a location approved by the Bailroad’s inspector or Engineer. As an over all lift of six inches (6") is required, the first raise should be approximately four inches (4") although considerable variation from this rule must be allowed to eliminate sags and humps in the existing grade line.” We believe that the speci- *72 fixations intend that a substantial raise shall be given the track initially, i.e. a raise of approximately 4". We do not believe that the specifications require a minimum raise of 4" since the statement is made that the first raise should be approximately 4" and this is further clarified by stating that a considerable variation must be allowed. We do not see how you can interpret the specifications to mean that the contractor is required to make a separate lift of approximately 2". The contractor is required, under the specifications, to make 2 lifts and the contractor is required to make 2 lifts totaling approximately 6" on the average. This is exactly what we are doing.
d. It seems that what you are questioning here is the procedure being followed rather than the results that are being obtained. If the railroad does not secure on the average a 6" raise and if the railroad does not secure 2 separate track raises then it would be quite clear that the contractor was violating the specifications. Inasmuch as 2 track raises are being made and inasmuch as the total average lift of 6" is being developed in the track, we believe that the specifications are being conformed with.
In addition to the foregoing, I think that it is well to quote further from the specifications as follows:
_ Stakes or lining points will be set for the center line of track by the Engineer and the track lined to same after the initial four inch (4") raise, but a lining gang shall follow one or two days behind the finished lift and spot up and line places found not [to] be holding up under traffic.
It seems that the initial raise is to be followed by a finished lift of indeterminate height as set out in the preceding quotations from the specifications. Two lifts only are required of which the first would be approximately 4".
The second paragraph of your letter of 6 July states that “ballast shall be obtained at the Spencer Pit”. The specifications further state:
* * * as the ballast material is being unloaded from center and side dump cars, one or more cars should be open at a time, allowing the required amount of ballast to flow out as the train is moved along slowly to provide the desired amount of material to be distributed as evenly as possible. The unloaded material shall be leveled down by means of a Jordan Plow or Spreader. Care must be taken not to disturb alignment markers, stakes * * *.
*73 If we now go back to Paragraph. CD-4(d), Page 24, we note that stakes are not set until after the initial 4" raise. It would seem very clear that the ballast spreading is to be performed after these stakes have been set since the statement is made “Care must be taken not to disturb alignment markers, stakes * * * .”
We will appreciate your referring the matter to the head of the department for arbitration if your decision of 6 July 1956 is final.
(b) On July 19, 1956, the contracting officer replied:
* * * I will be glad to forward to the Secretary of the Interior an appeal * * * as outlined in your letter * * * if you will incorporate in a letter addressed to the Secretary * * * your position, forward same to me, and request that I forward it to the Secretary. This will be in strict conformity with Clause 6 * * *.
In the meantime, you will proceed diligently with the performance of the contract in accordance with my letter of July 6,1956.
(c) On August 6,1956, plaintiff addressed to the Secretary of the Interior a formal appeal from the contracting officer’s ruling of July 6.[16]
(d) Meanwhile, plaintiff proceeded with the performance of the contract in conformity with the contracting officer’s ruling.
(e) The contract work was completed in September and was accepted by the Eailroad on October 11,1956.
14. (a) Following is the text of the last paragraph of plaintiff’s letter of August 6, 1956, to the Secretary of the Interior:
Earlier in the year the Contracting Officer called on us for a quotation for bank widening and sag raising on the track area of the subject contract work. A quotation for the performance of such work was made to the Contracting Officer and the Contracting Officer found it to be unacceptable. The Contractor feels that he is now being required to perform this bank widening and sag raising work under the terms of the subject contract which should be clearly recognized as different than that covered by this contract and extra to the subject contract work. The quantity of ballast material to be *74 unloaded to perform, tbe work as directed by the Contracting Officer will exceed the contract quantity by some 30 to 40 percent. It seems apparent that the Contractor is being required to perform substantial extra work for which equitable reimbursement has not been offered.
(b) The contracting officer, in his letter of September 24, 1956, to the Secretary of the Interior, commented on the foregoing as follows:
Contractor, in the last paragraph of its letter of August 6, states that the quantities of ballast to be unloaded to perform the work as directed by the Contracting Officer will exceed contract quantity by some 30 to 40 per cent. The facts do not support this statement. The job project has now been completed, and the ballast quantities exceeded the contract quantities by approximately 20% only, which figure is well within the allowable variation provided in Paragraph GR-14 of the contract, wherein the government reserves the right to increase or decrease any quantity by 25% without an adjustment in the unit bid price.
Contractor also complains that early in 1955 I, as Contracting Officer, called for a quotation for bank-widening and sag-raising on the track area in question, and that a quotation therefor submitted by Contractor was found to be unacceptable. The Railroad did consider doing additional work, such as bank-widening, in connection with this contract, but the Contractor’s quotation for this additional work was unrealistic and excessive, and it was deemed to be in the best interest of the government to forego this additional work.
15. (a) Plaintiff loaded and hauled 1,227 cars of new ballast. The specifications recite a capacity of 42 cubic yards for each car. On this basis, the total of new ballast loaded and hauled was 51,534 cubic yards. The contracting officer credited plaintiff with 51,510 cubic yards.[17]
(b) While the contract work was under way, plaintiff’s president questioned the accuracy of the 42-cubic-yard measurement, contending that, as the cars were actually loaded, there were more than 48 cubic yards in each car.[18]
*75 (c) Plaintiff requested the contracting officer to compute the pay quantities at the higher figure. The contracting officer refused to do so. Plaintiff duly appealed this ruling to the Secretary of the Interior.[19]
16. (a) The evidence warrants the finding that each car (except for the minor shortages heretofore noted) was loaded with 48 cubic yards of ballast; and that plaintiff loaded, hauled, and placed a total of 58,872 cubic yards of ballast.
(b) The contract called for a total of 43,011 cubic yards of ballast. On the basis of the computation to which the contracting officer adhered, the overrun (of 8,490 cubic yards)[20] represented less than 20 percent of the required quantity. On the basis of the finding in the preceding paragraph the overrun (of 15,861 cubic yards)[21] represented more than 36 percent of the required quantity.
(c) In relation to paragraph 14 of the General Requirements of the specifications:[22] (1) the quantity of ballast loaded, hauled, and placed in the performance of the contract exceeded the quantity proposed in the bid item by more than 25 percent; and (2) no alteration was ordered in writing with respect to the loading, hauling, or placing of such excess quantity.
17. (a) The ballast which plaintiff used was prepared and stockpiled by another contractor. Representatives of plaintiff, who ultimately prepared plaintiff’s bid, had knowledge of arrangements in contemplation for the preparation and stockpiling of the ballast before the contract therefor was made. These arrangements included the use of conveyor belts at the stockpile. In the preparation of plaintiff’s bid, the assumption was made (and the bid so based) that conveyor belts would be installed at the stockpile and that plaintiff would be permitted to use such equipment in loading the cars.[23]
*76 (b)Conveyor belt equipment was not installed at the stockpile. Plaintiff used a power shovel to load the ballast material. The cost of the use of the shovel was 37 cents per cubic yard.
18. (a) Both of plaintiff’s appeals[24] to the head of the Department were referred by him to the Board of Contract Appeals of the Department of the Interior, where they were consolidated as Docket No. IBCA 83 and referred to a Hearing Official.
(b) The Hearing Official conducted hearings in Seattle, Washington, on December 2, 3, and 4, 1957, accumulating a transcript of 406 pages and 52 exhibits. Both parties were represented by counsel[25] and both parties presented witnesses and offered exhibits.
(c) On February 12, 1959, the Hearing Official transmitted to the Board his recommended findings and order, together with “the complete file, record, exhibits, and briefs * * Thereafter, the parties were afforded opportunity to file exceptions to the examiner’s[26] report, and briefs.
(d) On June 16, 1959, the Board decided plaintiff’s appeals, affirming in part, and reversing in part, the rulings of the contracting officer.
19. (a) Plaintiff’s petition in this court was filed on June 25, 1959. Defendant answered on August 25, 1959.
(b) On September 14, 1959, counsel for the parties appeared before the trial commissioner for a pretrial conference. The pretrial conference memorandum, filed September 16,1959, contained the following:[27]
Pursuant to the terms of Pule 38 (c), the parties stipulated, with the approval of the Commissioner, to limit the trial in the first instance to the issues of law and fact relating to the right of plaintiff to recover, and to reserve the determination of the amount of recovery, if any, for further proceedings.
*77 (c) The pretrial conference memorandum also contained the following:
The evidence is contained in (1) the Official Report of Proceedings before the Board of Contract Appeals of the Department of the Interior in Docket No. IBCA-83 in the matter of William A. Smith Contracting Company, Inc., and The Alaska Railroad, together with (2) the exhibits received by the Board in that Proceeding, and (3) the Recommendations of Hearing Official and the Decision of the Board.
The transcript of testimony before the Board consists of three volumes containing a total of 406 pages. The parties have stipulated that each of the witnesses whose testimony is contained in the transcript would, if palled as a witness to testify under oath in this proceeding in the Court of Claims, testify as he did before the Board.
The Board’s transcript was received in evidence by the Commissioner subject to the reservation by him of the right to demand to hear the testimony of any or all witnesses, if, in the course of the preparation of his report, he should encounter any conflict of testimony or question of credibility which in his judgment would render such action advisable.
(d) No evidence in the case has been received by the trial commissioner pursuant to the reservation contained in the preceding paragraph.
20. (a) With respect to plaintiff’s claim for extra track lifting, the Interior Board of Contract Appeals upheld the contracting officer and denied plaintiff’s claim. After summarizing the facts and the contentions of the parties, the Board’s opinion said, in part:
Paragraph CD-4 of the specifications flatly said that ballast “will be spread to make two separate track lifts,” and this can only mean that each of these lifts must include the spreading of ballast as one of its component procedures. Furthermore, the ballast so spread must be new ballast. * * * [T]he use of new ballast * * * is necessarily implied * * *.
(b) With respect to plaintiff’s claim for larger pay quantities of ballast, the Board sustained its examiner’s finding that the average carload contained 48 rather than 42 cubic yards; ruled that plaintiff was entitled to payment “for loading, hauling and spreading * * * 58,872 cubic yards * * *;”and directed the contracting officer to take appropriate action *78 for the allowance of additional compensation in the amount of $7,362.[28]
(c) Plaintiff’s claim for an adjustment of the unit price for ballast was submitted to and considered by the Hearing Official[29] as a claim for “an increase amounting to 87 percent in the unit bid price * * *,”[30] applicable to the entire 58,872 cubic yards loaded and not limited to the overrun.[31] The Hearing Official examined and analyzed the claim as it was presented to him and recommended against its allowance.[32]
(d) The Board, in its opinion, said that it shared “the opinion of the examiner that the appellant has failed to prove that it is entitled to an increase in the unit price on account of such overrun, whether the calculation be made on the basis of the total quantity * * * or only on the amount of the overran.” The Board added:
* * * it would certainly be necessary for the appellant to establish * * * that its costs for loading, hauling and placing ballast, together with a reasonable allowance for profit on this work, exceeded $1.00 per cubic yard. The evidence offered is, however, insufficient to admit of an informed judgment as to the existence of this essential fact, and, hence, there is no basis for an increase in the unit price.
(e) The Board’s Conclusion was that “the findings of fact and decisions of the contracting officer are affirmed with re *79 spect to Claim No. 1, and reversed with respect to Claim No. 2, and he is directed to proceed as outlined * *
21. (a) With respect to plaintiff’s claim in this court for an adjustment of the unit price bid for loading, hauling, and placing ballast, the evidence is insufficient to show that the use by the contractor of a power shovel to load the ballast, in lieu of the conveyor belt equipment it had contemplated using, resulted in any increase in the cost of loading the ballast.
(b) There is no evidence to suggest that any increase was incurred in the unit cost of hauling ballast.
(c) The evidence does warrant the inference that an increase may have been incurred in the unit cost of placing ballast, because of the extent (in length and depth) of the sags that had to be filled.[33]
22. (a) Before submitting a bid, representatives of plaintiff walked over sections of the track, examined the ballast and ties then in place, and concluded that the track would have to be given an initial raise for replacing and respacing ties, which would then have to be tamped into place with existing ballast; that the track could then be lined; that new ballast would then be spread (without an additional lift); and that a second spread of ballast would be made, to be followed by the second and final raise (when the ballast would be tamped into place) .[34]
*80 (b)There is no evidence to indicate that plaintiff’s representatives made or undertook to make an estimate of the extent of the work required in raising sags.[35]
23. (a) None of the findings, conclusions, or decisions of the Interior Board of Contract Appeals was either arbitrary, or capricious, or so grossly erroneous as necessarily to imply bad faith, or lacking in support by substantial evidence.[36]
(b) With respect to plaintiff’s claim for extra track lifting, both the contracting officer and the Board of Contract Appeals predicated their findings and decisions upon an interpretation of the contract specifications.
(c) With respect to plaintiff’s claim for larger pay quantities of ballast: (1) the contracting officer predicated his finding and decision upon an interpretation of the contract specifications; while (2) the Board of Contract Appeals disregarded the contracting officer’s interpretation and predicated its finding and decision upon a mathematical computation, using components drawn from the evidence.
(d) With respect to plaintiff’s claim for an adjustment of the unit price for loading, hauling, and placing ballast: (1) the evidence does not show the basis of the contracting officer’s finding and decision; while (2) the decision by the Board of Appeals was founded upon what it described as a failure of proof but which was, in essence, an interpretation of the relevant provision of the contract specifications.
*81 CONCLUSION OP LAW
Upon the foregoing findings of fact, which, are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and its petition will therefore be dismissed.

 At the pretrial conference the parties stipulated, with the approval of the commissioner, to limit the trial in the first instance to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings. Finding 19(b).

 The parties stipulated that each of the witnesses whose testimony is contained in the transcript would, if called as a witness to testify under oath In this proceeding in the Court of Claims, testify as he did before the Board. Finding 19(c).

 Although plaintiff alleged in its petition that the administrative decisions were “arbitrary, capricious and/or so grossly erroneous as necessarily to imply bad faith, and * * * not supported by substantial evidence * » * ,” It has abandoned this position. No request for a finding of this nature was submitted by plaintiff. Moreover, finding 23(a) recites that “none of the findings, conclusions, or decisions of the * * * Board was either arbitrary, or capricious, or so grossly erroneous as necessarily to imply bad faith, or lacking in support by substantial evidence.”

 109 Ct. Cl. 390, 418 (1947).

 117 Ct. Cl. 92, 213 (1950).

 United States v. Wunderlich et al., 342 U.S. 98 (1951).

 Without stating its analysis of the various claims the court observes that: “Although there was some dispute below, the parties now agree that the question decided by the department head was a question of fact.”

 Act of May 11, 1954, 68 Stat. 81; 41 U.S.C. 321, 322.

 Following is the text of section 1: “No provision of any contract entered into by the united States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: Provided, however, That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.”

 Computation shows 51,534 cubic yards of 1,227 cars at 42 cubic yards per car. There was an incidental shortage of 24 cubic yards, not now in dispute, which reduced the contracting officer’s pay quantity to 51,510 cubic yards.

 The claimed quantity also makes allowance for the shortage of 24 cubic yards described in the preceding footnote.

 The amount allowed by the Board of Contract Appeals ($7,362) was received by the contractor on August 24, 1959.

 In rejecting the interpretation which he ascribed to the contractor, the examiner said: “The purpose of GR-14 is to permit the parties to have a second look at the bid price in the light of the changed quantities only, and to adjust for any proper and equitable change in unit costs which would result because the amount of work itself was different from that anticipated when the bid was made. * * *”

 As shown by finding 15(c) and footnote 19 appended thereto, plaintiff requested the adjustment of the contracting officer, who refused to accede. This fact was established, not by evidence, but by the pleadings.

 In other words, an overrun of 25 percent in volume should not, ipso facto, authorize a reexamination of the unit bid price looking toward an adjustment in the contractor’s favor. The larger volume might have resulted in a reduction of unit costs. If so, the contracting officer should be satisfied with evidence to that effect before requiring a downward adjustment.

 The text of finding 17 and footnote 23 appended thereto follow: “The ballast which plaintiff used was prepared and stockpiled by another contractor. Representatives of plaintiff, who ultimately prepared plaintiff’s bid, had knowledge of arrangements in contemplation for the preparation and stockpiling of the ballast before the contract therefor was made. These arrangements included the use of conveyor belts at the stockpile. In the preparation of plaintiff’s bid, the assumption was made (and the bid so based) that conveyor belts would be installed at the stockpile and that plaintiff would be permitted to use such equipment in loading the cars. (Plaintiff does not contend that the contract in suit contained any mention of conveyor belt equipment.) Conveyor belt equipment was not installed at the stockpile. Plaintiff used a power shovel to load the ballast material. The cost of the use of the shovel was 37 cents per cubic yard.”

 Finding 21(c).

 Finding 21(c) and footnote 33 appended thereto recite that the evidence does warrant the inference that an increase may have been incurred in the unit cost of placing ballast, because of the extent (in length and depth) of the sags that had to be filled. This inference flows from the fact (also Inferred from the evidence as a whole) that the filling of sags and widening of banks accounted for the overrun of 36 percent in the total ballast used.

 Finding 9(c).

 Finding 12(b).

 Finding 13(a).

 As set forth In findings 5 and 6.

 AH humps -would have to have some new ballast, for drainage. Sags might (and, In actuality, did) require considerably more than 6 inches of new ballast to bring them up to grade.

 Footnote 14, appended to finding 12(c),

 “Finding 14(a).

 The Alaska Railroad was and is an agency of the United States Department of the Interior.

 GR — 12. BIDS.

 Plaintiff is a Missouri corporation. Its main office is in Kansas City, Kansas.

 Contract No. 14-04-003-1044.

 The superintendent used this title in his correspondence with the contracting officer. He is identified in the testimony as project manager for plaintiff.

 As required by GR-22, supra, calling for “a schedule showing * * * proposed progress, work layout, locations, etc., of various phases of the work.”

 Tlaintiff’s superintendent testified that he did not remember just what operations he had in mind for this period.

 The contracting officer never formally designated a project engineer, as he was authorized to do by GR-3, and never delegated any of the authority of the contracting officer to the engineer who served in the capacity of project engineer.

 When the testimony in this case was heard, defendant’s project engineer was ill. He did not testify.

 Standard ties were 8 Inches wide, 7 Inches deep, and 8 feet long. The average lift was less than 4 Inches. The precise extent of the average lift is not established by the evidence. The inference supported by the evidence as a whole is that it was nearer 2 inches than it was to 4 inches.

 Most of the existing ballast consisted of the pit-run gravel used when the line was built many years earlier. The pit-run ballast contained a larger percentage of fines than the crushed rock specified for use as new ballast.

 When the ties were lifted out of the existing ballast, empty sockets remained where the ties had been. By filling these sockets (to the extent of 2 or 3 inches) a net lift resulted when the supporting jacks were removed. Plaintiff considered this raise as part of the overall 6-inch raise required by the specifications. This initial raise was kept below 4 inches in order to assure the presence of enough ballast material to prevent the complete skeletonizing of the track.
Track is said to be completely skeletonized when the ties rest on the roadbed with no material in the cribs. The vibration of trafile moving over a skele-tonized track tends to jar the rails out of alignment and to upset the spacing of the ties.
A crib is the space between two ties, from top to bottom and end to end. (Each crib represents .1908 cubic yard of space. Over the distance of one mile of track, cribs on The Alaska Railroad represented 567 cubic yards of space.)
Plaintiff used existing ballast in the cribs (1) to fill the voids under the lifted ties and (2) to repack between the ties to avert skeletonizing. If all of the cribs had been full of ballast, there would have been enough material to fill 4-inch voids under the ties and still repack the ties against skeletonizing. All of the cribs, however, were not full of ballast. Plaintiff therefore gauged its initial, out-of-face lift by the amount of ballast available in the cribs on the average.

 This work, he said, was incident to the tie work.

 The evidence contains no adequate explanation of the mathematics of the ballast volume. Construction Detail No. 4 (Bid Item No. 4; finding 5) directed that “Ballast to make an average 6" raise (1,770 cubic yards per mile) will be spread * * The space occupied by one mile of roadbed (6 inches deep, 9 feet wide) plus 2,981.64 cribs (8 feet by 7 inches by 13.25 inches) represents 1,449 cubic yards. The specification of 1,770 cubic yards *71 per mile may have represented the Government’s emphasis of its desire for a full 6-inch raise, since compaction of ballast (measured -when loaded as loose gravel) would account for the shrinkage of 1,770 cubic yards (loose) to 1,449 cubic yards compacted. (Such shrinkage would represent a diminution of volume of 18 percent. Shrinkage of 20 to 25 percent for full compaction is not unusual.)
If the foregoing did represent the Government’s intention, its specification of 1,770 cubic yards per mile (43,011 cubic yards total) made no allowance for extra yardage required to fill sags.
On the other hand, if the emphasis of the specifications was upon the requirement of an “average” raise of 6 inches, the denomination of 1,770 cubic yards per mile would reflect an allowance of 18 percent overage (in excess of the 1,449 cubic yards of space) for use in the filling of sags.
The evidence is insufficient to warrant a determination of the intent of the specifications in this respect.

 Some of the sags proved to be extensive, requiring filler (ballast) to the extent of 16, 18, and 20 inches deep in places.

 This letter was duly forwarded by plaintiff to the contracting officer, who, In turn, on September 24, 1956, forwarded It to the Secretary of the Interior with a statement of his own.

 This computation represents 1,227 ears of 42 cubic yards each, minus a shortage of 24 cubic yards which is not now in dispute.

 Using 48 cubic yards as the accurate measurement, and making allowance for the shortage of 24 cubic yards, plaintiff loaded and hauled 58,872 cubic yards of ballast.

 Plaintiff by its petition bas alleges, and defendant by its answer bas admitted, that tbe contracting officer decided (and tbe Board of Contract Appeals, for the head of tbe Department, affirmed tbe decision) that tbe contractor was not entitled to an adjustment, under paragraph GR--14 of the specifications, of the unit price bid for ballast.

 Representing the difference between 51,510 and 43,011 cubic yards.

 Representing tbe difference between 58,872 and 43,011 cubic yards.

 Por text refer to finding 6.

 Plaintiff doeB not contend that tbe contract in suit contained any mention of conveyor belt equipment.

 One relating- to the contracting officer’s requirement of two lifts on new ballast (finding 13(c)) ; and one relating to tbe contracting officer’s refusal to recompute tbe pay quantities of ballast (finding 15(c)).

 Plaintiff was represented at the hearings by tbe same attorney who Is Its attorney of record In this case. Defendant’s attorney In this court did not represent defendant before tbe Board.

 This designation of tbe Hearing Official as tbe Board’s “examiner” Is adopted from the language of tbe Board’s decision.

 No exceptions to tbe pretrial conference memorandum were filed.

 This figure represents the unit bid price of $1 per cubic yard applied to the difference between the contracting officer’s allowance of 51,510 cubic yards and the Board’s finding of 58,872 cubic yards. The sum of $7,362 was paid to the contractor on August 24,1959.

 As for consideration of this claim by the contracting officer, see footnote 19, finding 15(c).

 Stated another way, plaintiff ashed for an increase from $1.00 to $1.37.

 So computed, pay for ballast would amount to $80,654.64, instead of $58,872, reflecting a difference of $21,782.64.

 The examiner’s report said: “The interpretation of the readjustment clause of GR-14 which the Contractor contends for, in its baldest terms, is that if a 25 percent overrun occurs, the Contractor is given the opportunity to reexamine its bid in the light of hindsight and its experience in carrying out the contract, and adjust its bid upward accordingly. In my judgment article GR-14 does not justify this interpretation. The purpose of GR-14 is to permit the parties to have a second look at the bid price in the light of the changed quantities only, and to adjust for any proper and equitable change in unit costs which would result because the amount of work itself was different from that anticipated when the bid was made. True, this element might affect the bid price for the entire amount of work done, and not just the overrun.”

 This inference flows from the fact (also inferred from the evidence as a whole) that the filling of sags and the widening of bants accounted for the overrun of 36 percent in the total ballast used. Cf. footnote 14, finding 12(c).
Except for the reference to sag raising and bank widening in the contractor’s letter of August 6, 1956, to the Secretary of the Interior (finding 14(a)), plaintiff has made no point in this court of the possibility of increased costs by reason of either sag raising or bank widening. Neither was such a possibility discussed before the Board of Contract Appeals.

 While this finding is based upon the testimony of plaintiff’s president (who had had many years of experience in railroad construction), his description of the contemplated operation is either incomplete or based on assumptions not spelled out.
The spreading of any considerable' quantity of ballast before raising the track for tamping must result in some ballast resting on ties. This would mean that, in lifting the track, the ballast on the ties would have to be lifted also. Plaintiff’s superintendent has indicated (finding 12(b)) that in actual operation a 5-inch spread was the maximum load permissible in practice. Plaintiff’s president, on the other hand, contemplated the spreading of all ballast (in two spreads) before any lift would be made for tamping. The spreading of 1,770 cubic yards of ballast per mile would result in a layer (across 9 feet of roadbed) 12 inches deep. If the spread should be limited to 1,449 cubic yards per mile, the layer would be 9.8S inches deep. In either event, the gravel would be deep enough to cover the rails.

 The 36 percent overrun in the quantity of ballast used, heretofore noted, is some indication of the extent of the sags. Further indication lies in the fact that the total quantity of ballast used (amounting to 2,423 cubic yards per mile) would have made a spread on the roadbed of a layer 16.5 inches deep, and, in place (under the ties and in the cribs), would have provided an average lift of 10 inches (allowing 20 percent shrinkage for compaction).
Plaintiff’s case, as presented, appears designed to invite the inference that there was some connection between the extent of the overrun in the quantity of ballast used and the contracting officer’s insistence upon two lifts on new ballast. No such inference is warranted.
A contrary inference is warranted, viz, that there was a connection between plaintiff’s assumption that one lift could be made on existing ballast and Its failure to extract from the specifications the full implications of spreading an average of 1,770 cubic yards of ballast per mile.

 Plaintiff’s petition alleged (paragraphs 27 and 28) that “The contrary decisions of the Contracting Officer and of the Board of Contract Appeals, are arbitrary, capricious and/or so grossly erroneous as necessarily to imply bad faith, and are not supported by substantial evidence and are contrary to law.” Plaintiff’s request to the commissioner for findings of fact contains no request for a finding of such nature.