**RANDOLPH ENGINEERING COMPANY**

v.

**The UNITED STATES.**

**No. 114–61.**

United States Court of Claims.
July 15, 1966.

Frank J. Gaffney, Pittsburgh, Pa., attorney of record, for plaintiff.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

## OPINION

REED, Justice (Ret.), sitting by designation.

The plaintiff is seeking compensation for cleaning work which the United States required it to perform as part of a contract between the parties to clear a defense plant and place the equipment for production of 155MM shells in government reserve storage. Plaintiff contends that the contract did not obligate it to do the type of cleaning demanded by the government. The government contends that the contract did necessitate such cleaning without extra pay. We have concluded that the government's interpretation is correct.

The reserve storage program was developed by Army Ordnance after the Second World War to facilitate any future mobilization by preserving presently unneeded defense production equipment in usable condition. Army Ordnance has established a number of storage facilities as depositories for such equipment.

This particular reserve storage project resulted from the government's decision in 1957 to cancel the production of 155MM shells at The Englander Company plant in Birmingham, Alabama. The Army's Birmingham Ordnance District was instructed to make the necessary arrangements for placing the equipment in reserve storage. Birmingham Ordnance originally decided to accomplish this in two stages. It would first let a contract to Englander to clear the plant and ship the equipment to the Michoud Ordnance Depot in Louisiana, the storage facility for the Birmingham District. Birmingham Ordnance would then let a second contract to rehabilitate the equipment, process it for long-term storage, and place it in final storage at Michoud.[1]

Plaintiff's officers were first contacted by an officer of the Englander Company who invited them to bid on the plant clearance and shipment subcontract and told them that he understood that Birmingham Ordnance would be letting a second contract for the rehabilitation work at Michoud sometime in the future.[2] Plaintiff is an industrial engineering firm which specializes in plant clearance and preservation work. Plaintiff has operated the Cleveland Ordnance District's storage facility at Lordstown, Ohio, and has processed substantial quantities of equipment for reserve storage under contracts with Army Ordnance.[3]

Englander furnished plaintiff with a copy of the contract specifications for removal of the machinery from Englander which were drawn by Birmingham Ordnance for plaintiff's guidance in pre-

1. See Finding No. 3.
2. Robert Shaw, plaintiff's vice-president said in his testimony before the Board of Contract Appeals that one of the Englander officers told him about the two contracts plan. Page 21, Record of the Armed Services Board of Contract Appeals, filed as joint exhibit before the Commissioner.
3. See Finding No. 27.

paring its bid. Although reserve storage processing work is normally done according to an Ordnance Manual which is entitled "Preparation, Handling, and Maintenance of Production Equipment for Reserve Storage" and which is commonly known as ORDM 4–6, Birmingham Ordnance did not simply instruct the contractor to do the work according to the manual. The contract specifications contained detailed instructions for each phase of the work. Some of these instructions incorporated parts of ORDM 4–6 by reference, some repeated instructions in ORDM 4–6, and others varied from ORDM 4–6 procedures.

The instructions for cleaning, preserving, and skidding were contained in Part 4 of the Englander specifications. The Part 4 instructions provided that each type of machinery should be cleaned in accordance with "good commercial shop practice," coated with a designated preservative, and skidded in accordance with ORDM 4–6.[4] For example, Paragraph 4.1.1 said:

> Metal working machinery will be cleaned of all chips, dirt, grease etc. in accordance with good commercial shop practice. External precision and other bright metal surfaces will be coated with MIL–C–16173, Grade 2, Preservative. Piping to a machine will not be cut but will be disconnected in a workmanlike manner with proper labelling for identification. Electrical supply cables will be handled in accordance with Paragraph 2.6, this Appendix. Skidding will be accomplished in accordance with ORDM 4–6.

When plaintiff's officers read the specifications, they concluded that the government did not want an ORDM 4–6 cleaning job. The instructions in ORDM 4–6 provide for the disassembly of equipment, hand-cleaning of individual parts with solvent, and reassembly of the equipment.[5] Plaintiff's officers had frequently seen commercial machine shops clean equipment of this type by simply blowing out the chips and wiping the exterior critical surfaces. They assumed that the government had used the term "commercial shop practice" to describe that type of superficial cleaning and computed their bid to Englander on that basis.[6]

T. A. Rivenbark, the industrial engineer at Birmingham Ordnance who drafted the specifications, testified that he was thinking of an altogether different commercial cleaning practice. Rivenbark said that commercial firms sometimes use mechanical techniques such as steam-cleaning and shot blasting to clean the external and internal parts of this type of machinery and that those techniques are less costly and time-consuming than hand-cleaning with solvent and accomplish much the same result. Therefore, he concluded that it would be advantageous to permit the contractor to use any accepted commercial cleaning method so long as the end result was equivalent to ORDM 4–6 cleaning.[7]

The plaintiff's conception of commercial shop practice cleaning differed radically from the type of cleaning Rivenbark said he had in mind. Plaintiff's officers assumed that they would not be required to perform any internal cleaning while Rivenbark meant that they could use mechanical techniques to accomplish the internal cleaning.

If the proposed Englander subcontract had been awarded to plaintiff, we would be inclined to uphold the plaintiff's interpretation. Since the type of cleaning plaintiff planned to do and the type of cleaning Birmingham Ordnance expected plaintiff to do are both commercial cleaning practices, we cannot say that the language of Part 4 necessarily requires one or the other. Under such circumstances this court has usually adopted the contractor's interpretation of an ambiguous government-drawn contract if the contractor actually and reasonably relied upon that construction at the time of the bidding. See WPC Enterprises, Inc. v.

---

4. See Finding No. 6.

5. See Finding No. 18.

6. See Finding No. 26.

7. Record of Commissioner, pp. 451–454.

United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963). Since this equipment was to be cleaned again as part of the rehabilitation contract it would have been reasonable to assume that the superficial cleaning plaintiff expected to perform would be adequate to maintain the equipment until the second cleaning was performed.

However, the proposed subcontract was never let. Englander decided that it did not want to assume responsibility for clearing the plant and asked Birmingham Ordnance to arrange plant clearance directly.[8] At about the same time Birmingham Ordnance learned that the Army did not have sufficient funds to rehabilitate the equipment. Therefore, Birmingham Ordnance decided to revise its plans and to let one contract to clear the plant, ship the equipment to Michoud, and place it directly into final storage at Michoud without rehabilitation.[9]

Michael Haworth, the contract specialist at Birmingham Ordnance, called the plaintiff and two other firms which submitted bids to Englander, told them Birmingham Ordnance was letting the contract directly, and arranged appointments to discuss the contract. Meanwhile Rivenbark revised the original specifications to serve as an appendix for the new contract. Since the processing work which he had expected to be done under the originally proposed subcontract would have been adequate for long-term storage, he made very few changes in the specifications. The revisions which Rivenbark made consisted primarily of the deletion of the word "temporary" at various places in the specifications which referred to temporary preservation and temporary storage.[10]

When Haworth met with Robert Shaw, plaintiff's vice-president, on November 8, 1957, Haworth told Shaw that there had been some changes in the specifications and asked him to note them on Shaw's copy of the Englander specifications. Haworth then dictated the changes to Shaw.[11]

Haworth also read Shaw a letter which was supposed to describe the purpose of the conference. Haworth's letter read in part:

You are requested to submit a proposal based on the following information:

1. To accomplish preservation for long term storage and skidding of equipment items in strict accordance with ORDM 4–6.

2. To load all items aboard common carrier at Birmingham, Alabama, to unload and place in storage at Michoud Ordnance Plant, Louisiana.

3. To include no amount for performing rehabilitation.

4. To include no amount for plant restoration.

You are advised that the Government would contemplate preservation for long term storage being performed at Michoud Ordnance Plant; however, you have the option to negotiate with The Englander Company for the use of their facilities in the event Plant Clearance and preservation could not be accomplished prior to the Close of Business, 16 December 1957. The Government desires that Plant Clearance be accomplished with the utmost speed, but in no event later than the Close of Business, 16 December 1957.[12]

Haworth did not explicitly tell Shaw that the two contracts plan had been abandoned. Since Birmingham Ordnance had never told plaintiff about the two contracts plan in the first place, there was no occasion to tell the contractor

---

8. See Finding No. 3.

9. Michael Haworth, government contract specialist at Birmingham Ordnance District, said in his testimony before the Commissioner that Birmingham Ordnance changed its plans because of a directive instructing the Ordnance Districts to discontinue the practice of having such equipment rehabilitated before placing it in storage. Record of Commissioner, pp. 282–285.

10. See Finding No. 5.

11. See Finding No. 5.

12. See Finding No. 5.

that there would never be a separate rehabilitation and long-term storage processing contract. Haworth's instructions to delete references to temporary storage and his letter stating that one purpose of the contract was to accomplish preservation for long-term storage were adequate to inform Shaw that the government now planned to put the equipment directly into final storage at Michoud.

Nevertheless, Shaw failed to grasp the significance of the letter and the terms of the proposed contract. He still thought the government wanted plaintiff to clear the plant, perform superficial cleaning, and deposit the equipment at Michoud to await final processing, including another more thorough cleaning, under a "second" contract.[13]

Plaintiff submitted a bid comparable to its original bid to Englander, Haworth objected that the transportation estimate was excessive, plaintiff reduced the bid, and Birmingham Ordnance decided to award the contract to plaintiff. Birmingham Ordnance then prepared a formal contract which incorporated the revised specifications as Appendix 1 and sent it to plaintiff for signature.[14] This contract was signed on November 26, 1957. Although the cover page designated it as "Contract for Removal, Transportation and Preparation for Long Term Storage of Government Facilities; Preparation of Shipment to Government Installation," plaintiff's officers still assumed that they were entering into a contract to prepare the equipment for temporary storage.[15]

Plaintiff then proceeded to clear the plant, ship the equipment to Michoud, and to clean the equipment according to its conception of commercial shop practice. The inspector refused to accept the equipment because plaintiff had not performed ORDM 4–6 cleaning. Plaintiff insisted that its contract did not require ORDM 4–6 cleaning.[16] The dispute was referred to a contracting officer who ruled that plaintiff must perform a cleaning job of ORDM 4–6 quality, but could use mechanical techniques to accomplish the cleaning.[17] The Armed Services Board of Contract Appeals affirmed the contracting officer. Randolph Engineering Co., 58–2 BCA 8651 (ASBCA 1958). Meanwhile plaintiff performed internal cleaning to the satisfaction of the inspectors. Plaintiff used the mechanical techniques authorized by the contracting officer in accomplishing that cleaning.[18]

Plaintiff contends that the Board's decision is inconsistent with this court's decision in WPC Enterprises, su-

13. Shaw's testimony before the Board of Contract Appeals indicates that in January, 1958, two months after the contract negotiations, Shaw was still under the impression that there would be a second processing contract. See Record, note 2 supra, p. 90.

14. See Findings Nos. 7, 8, 10, 11.

15. See Finding No. 13, and note 13, supra.

16. See Findings Nos. 19, 20.

17. The contracting officer's decision took the form of a letter of February 4, 1958, which read in part:
   "The minimum acceptable standards to which the Government will accept work and services under Contract DA–01–009–ORD–592 will be that cleaning which will allow the application of preservatives internally and externally for long-term storage under conditions of controlled humidity to the extent that such preservation will be in accordance with ORDM 4–6 and all other terms of the contract.
   "Workmanship and services which lead to results less satisfactory than under the foregoing procedures will not be accepted as compliance with the contract." (Board Exhibit 9.)
   The government witnesses interpreted this to mean the cleaning must be of ORDM 4–6 quality in order to accomplish ORDM 4–6 preservation while implying that ORDM 4–6 cleaning procedures need not be followed.

18. Government witnesses testified that plaintiff's crew did use steam-cleaning and that the end result was compatible with ORDM 4–6 standards. Board Record, note 2 supra, pp. 444–446.

pra.[19] According to the plaintiff's interpretation of WPC Enterprises the contractor's interpretation of an ambiguous term must be adopted if the government drafted the contract. However, the plaintiff's interpretation is not an accurate statement of the *WPC Enterprises* rule. *WPC Enterprises* says that the contractor's interpretation of a government-drawn agreement will be adopted if the contractor *actually* and *reasonably* relied upon that interpretation when it entered into the contract, 323 F.2d at 876, 163 Ct.Cl. at 6. Although the evidence in this record indicates that this contractor actually relied upon its present interpretation of commercial shop practice cleaning at the time it entered into the contract, the evidence also indicates that the contractor's interpretation was not a reasonable interpretation.

Since Haworth's letter, Haworth's instructions to delete references to temporary storage, and the title of the contract were adequate to inform plaintiff's officers that Birmingham Ordnance planned to put this equipment directly into long-term storage, plaintiff must be held accountable for everything its officers would have known if they had understood that this was Birmingham Ordnance's plan. We do not believe that plaintiff's officers could have reasonably concluded, given their knowledge of the reserve storage program and the techniques of preservation, that the government was contracting to put this equipment into final storage at Michoud without internal cleaning. Government experts testified that this type of machinery is likely to rust if it is placed in storage for a long period of time without internal cleaning.[20] The plaintiff's president, who was himself one of the pioneers in the development of the art of preservation, agreed generally with the conclusions of the government witnesses. He said in his testimony before the Board that it would be poor policy to put such equipment into long-term storage without internal cleaning.[21]

Plaintiff's officers did testify that the danger of rust is greatly diminished if the humidity is properly controlled and that it would be possible to preserve such equipment in usable condition by placing it in humidity-controlled storage without cleaning. They testified that the Army has sent a substantial amount of equipment which had not been cleaned at all

19. Since the interpretation of the contract provision is a question of law, this court is obligated to reach its own conclusion on that issue. See Wm. A. Smith Contracting Co. v. United States, 292 F.2d 854, 857, 155 Ct.Cl. 44, 48 (1961). We have considered the evidence in both records, the opinion of the Board of Contract Appeals, and the report of our Commissioner in reaching our conclusion.

The Board record was introduced as a joint exhibit in the proceedings before our Commissioner. Neither party objected to the introduction of new evidence before the Commissioner although they were aware that the question of the propriety of taking additional evidence was then being litigated in the United States Supreme Court. After the Supreme Court announced its decision in United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S. Ct. 1409, 10 L.Ed.2d 652 (1963), the government moved to strike all of the new evidence which the Commissioner had received. The Commissioner denied the government's motion in an opinion dated August 22, 1963. The Commissioner held that the government's failure to object to the new evidence at the time of its introduction constituted a waiver of the Bianchi objection within the meaning of this court's decision in Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963). The government has not appealed from the Commissioner's ruling. Therefore, we have considered the evidence in both records.

20. Robert Bockewitz, Chief of the Standards Branch, Engineering Division, Army Production Equipment Agency, testified in the hearings before the Commissioner that the preservative material would not be effective to prevent rust if the machines were not thoroughly cleaned before the preservative was applied. He also said that such rust is likely to cause substantial damage to precision instruments and that over half of the production equipment from the Englander Company falls into that category. Record of Commissioner, pp. 811–815.

21. See Board Record, note 2 supra, pp. 166–168.

to the humidity-controlled storage facility at Lordstown. Plaintiff would apparently have us infer from this that it would not be unreasonable to place dirty equipment into long-term storage at Michoud. We do not believe that such an inference is possible. The evidence indicates that the atmospheric conditions at Michoud are not controlled to the same extent as those at Lordstown and that the danger of rust is substantially greater.[22] Since Shaw visited Michoud on the day before he talked with Haworth, he undoubtedly observed that the storage facilities at Michoud are not equivalent to those at Lordstown. Therefore, he could not have expected the Army to put this equipment into final storage at Michoud without internal cleaning.

Shaw's own statements confirm that he would never have expected the Army to do this. Shaw's memorandum of December 19, 1957, advising his colleagues that the ordnance inspectors had refused to accept the equipment states: "This information was more in keeping with my thoughts on the matter, since I felt certain they would not permit equipment of this nature to only be commercially processed [sic] and then placed in final storage."[23]

If plaintiff's officers had understood, as they should have understood, that Birmingham Ordnance planned to put this equipment into long-term storage at Michoud, they undoubtedly would have realized that Birmingham Ordnance must have meant something other than external cleaning when Birmingham Ordnance instructed them to perform "commercial shop practice" cleaning. Therefore, the contractor's interpretation was not reasonable and the *WPC Enterprises* rule is not applicable to this case.

Under these circumstances we think the Board properly concluded that the term "commercial shop practice cleaning" must be interpreted in the light of the purpose of the contract to mean commercial practices for accomplishing internal cleaning. Randolph Engineering Co., 58–2 BCA 8651 (ASBCA 1958). Therefore, plaintiff is not entitled to additional compensation for performing such cleaning.

Judgment is entered for defendant and plaintiff's petition is dismissed.

54 CCPA

---

22. See Bockewitz testimony at pp. 823–825 of the Record of the Commissioner.

23. The December 19 memorandum was introduced into evidence as Defendant's Exhibit 8.