**DANA CORPORATION**

v.

**The UNITED STATES.**

**No. 390-70.**

United States Court of Claims.

Dec. 12, 1972.

---

Maurice J. Gilchrist, Bronxville, New York, for plaintiff; Robert D. Witte, attorney of record. Witte & Witte, Bronxville, N. Y., of counsel.

Gerald L. Schrader, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Franklin M. Stone with directions to file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on April 21, 1972, in which such facts as are necessary to the opinion are set forth. Defendant has filed a request for review by the court of part of the commissioner's opinion and report, and plaintiff in effect filed a belated request for review of other parts of the opinion and report. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. The court hereby adopts the trial commissioner's opinion with modifications—as hereinafter set forth—and modifies his conclusions, also as hereinafter set forth. The *modified* opinion and conclusions form the basis for the court's judgment in this case. Therefore, defendant's motion for summary judgment is granted and plaintiff's motion is denied with respect to the kits packaged prior to April 6, 1967; with respect to the kits packaged between April 6, 1967, and July 19, 1967, further proceedings in this court are suspended pursuant to Rule 167 for a period of six months to afford the parties an opportunity to obtain administrative resolution of the issues specified *infra* in the opinion.

Commissioner Stone's opinion, as modified by the court, is as follows:

This contract case is before the court on plaintiff's motion and defendant's cross-motion for summary judgment. The court is called upon to review, in accordance with the standards prescribed by the Wunderlich Act,[1] a decision rendered by the Post Office Department Board of Contract Appeals (POD BCA) on March 30, 1970,[2] denying plaintiff's claim for additional compensation in the amount of $55,193.25, for packaging charges on shipments of 10,513 rear axles sold and delivered to the Post Office Department ("POD" or "Department") by plaintiff.

1. 41 U.S.C. §§ 321–22 (1970).

2. POD BCA No. 278, 70–1 BCA ¶ 8201.

Over the years between 1951 and 1966, the POD had procured about 20,000 mailster-type three-wheel vehicles. Plaintiff, a major manufacturer of axles, had previously furnished rear axles to several prime contractors for inclusion in these "mailsters" which they had sold to the POD. Problems of vehicle stability and safety were encountered and studies were initiated to correct same in which plaintiff participated. In June 1966, the POD decided to replace, as soon as possible, the rear axles of a substantial number of these mailsters with axles of larger dimension to provide greater vehicle stability.

On June 8, 1966, the Department issued a "Request for Quotation" (RFQ) for the replacement of rear axles, on a modified Standard Form 33.[3] The items to be supplied were described in said request as follows:

AXLE MODIFICATION RETROFIT KITS, Part No. 25700–IX (6,413 Kits) and Part No. 25699–IX (2,600 Kits), manufactured by the Dana Corporation, Salisbury Division, 2601 Tyler Avenue, Fort Wayne, Indiana, including instructions for installation on the Westcoast and Universal Fiberglas ¼-ton vehicles. The instruction sheets shall be of the exact types the contractor normally furnishes commercially for these type kits.

The request called for the offer "F.O. B. CARS OR WHARVES, POINT OF MANUFACTURE * * *," and in this connection further stated in pertinent part: "Prices are desired for complete delivery, F.O.B. * * * in * * * days from the date of award of contract."

The request also contained, inter alia, the following pertinent provisions:

Offeror is required to state approximate Gross Weight in pounds ———, Height ———, Width ———, Depth ——— in inches of cartoned kits.

This will be used only for determining the means of making shipments and for the issuance of shipping instructions.

PACKAGING: Each axle modification retrofit kit is to be packaged separately in accordance with the best standard commercial practices for this type commodity.

PACKING: Each packaged kit is to be prepared for shipment in a manner to insure carrier acceptance and safe delivery to destination at the lowest applicable rate. Containers shall conform to the Consolidated Freight Classification Rules or other carrier regulations applicable to the mode of transportation.

Plaintiff completed, signed, and returned the modified Form 33, together with a letter dated June 21, 1966. The form contained a quotation of $84.67 per kit for the 6,413 kits (Part No. 25700–IX), for a total of $542,988.71, and an identical quotation per kit for the 2,600 kits (Part No. 25699–IX), for a total of $220,142. Beside this quote was a notation of "See letter." In addition, it indicated that a Federal Excise Tax of $6.77 per unit should be added unless proof of exemption certificate was provided for both items.

The aforementioned letter provided in part as follows:

The price of $84.67 per retrofit kit is based on standard commercial pack of five axles per pallet, and loose parts in a bag attached to the axle.

For kits packed individually, add $4.50 each to the quoted price. For kits packed individually, six per expendable pallet, add $5.25 each to the quoted price.

The letter contained no other mention of packing or packaging.

The evidence in the record is undisputed that plaintiff had not completed the kit design nor the disassembly and

3. December 1964 Edition, GSA. General Provisions, Standard Form 32 June 1964 Edition, which contained, inter alia, standard "Disputes" and "Changes" clauses, were incorporated by reference.

installation procedures at the time of the submittal of its proposal, and that certain members of the POD (particularly in the Research and Engineering Division) were aware of this fact.

For clarification at this point, it should be noted that defendant contends that plaintiff's June 21, 1966 letter gave the POD a choice between three alternative methods of packaging, with the price for each method listed. Plaintiff, on the other hand, contends that the letter offered defendant no choice but set out three alternatives, with the one to be utilized governed by the design and configuration of the kit and its disassembly and installation procedures when that work was completed.

In a letter dated June 30, 1966, Edwin R. Itnyre, the Contracting Officer, advised plaintiff that its proposal in the total amount of $824,148.72 had been accepted and authorized plaintiff to proceed immediately. He also stated therein that a copy of the definitive contract, dated June 30, 1966, would be forwarded to plaintiff at an early date. The $824,148.72 represented 9,013 kits (total number required by contract) at $91.44 per kit, which was the unit price of $84.67, plus the Federal Excise Tax of $6.77. However, only the total amount was stated in the letter.

By July 14, 1966, the definitive contract, which consisted essentially of the modified Standard Form 33 (see n. 3, *supra*), as completed and signed by plaintiff on June 21, 1966, was delivered to plaintiff. The form was signed by Mr. Itnyre, as Contracting Officer, and showed the date of award to be June 30, 1966, and the amount of the contract as $824,148.72. In addition, it contained a new sheet, numbered 2C, entitled "IMPORTANT NOTICE TO SUCCESSFUL CONTRACTOR." This notice advised that the bid accepted included any acceptable modifications and clarifications to the bid prior to the date of award, and specifically listed, among others, plaintiff's letter of June 21, 1966. The insert also included the following provision: "Accepting standard commercial pack of 5 axles per pallet, and loose parts in a bag attached to the axle." It further noted that the award amount included an 8 percent Federal Excise Tax and that in the event the tax was not applicable, the contract would be reduced accordingly. On September 10, 1966, the POD issued Amendment No. 1 to the contract adding 1,500 kits to be furnished by plaintiff at $91.44 for an increase of $137,160, resulting in a new total contract price of $961,308.72 for 10,513 kits. The kits were added in accordance with a contract provision which allowed the Government to increase the quantity up to 25 percent at the contract unit price within 90 days after award of the contract.

Motivated by the fact that the mailster vehicles at many destinations were idled for lack of suitable rear axle equipment, Julius E. Hall, Contract Administrator for the POD, proceeded to gather necessary information for issuing complete shipping instructions with a suitable priority list based on relative urgency of need for the kits. Mr. Hall obtained shipping lists prepared by the Vehicles Branch, Maintenance Division, POD, which he routed to William Roe, the POD's traffic man, for proper routing instructions and specification of carriers.

In August or September 1966, Henry Workman, plaintiff's Material Handling and Packaging Engineer, devised a system of individual packaging, 15 to a pallet, on the assumption that the large components would not be attached to the axle. However, the final decision on the design and configuration had not been made. Mr. Workman testified that if it had been determined to attach the large items to the axle, he would not have proposed individual packaging. Mr. Workman was not involved in the contract area and did not know of the packaging provisions of this contract. On or about October 14, 1966, Mr. Workman talked with Mr. Roe on the telephone. Messrs. Workman and Roe gave conflicting accounts of the discussion that took place during this tele-

phone conversation. Both of these accounts were credible, and, therefore, the Board's finding is adopted. *See* Williamsburg Drapery Co. v. United States, 369 F.2d 729, 733, 177 Ct.Cl. 776, 783 (1966). The Board found as follows: "Mr. Workman mentioned his plan for 'tiering' the pallets and Mr. Roe said 'that is done all the time.' Mr. Roe did not say anything which departed from the opinion he gave Mr. Hall, namely that there was no transportation objection to shipping five axles per pallet with loose parts in a bag. * * * " 70–1 BCA ¶8201, at 38, 138. Nevertheless, on October 14, 1966, Mr. Workman sent the following letter to Mr. Roe:

> Confirming our phone conversation of this date, whereby the following information was given to you on the Standard Packaging of Axle Assembly Kits.
>
> The Axle Assembly and Component parts will be individually packed and shipped as kits. There will be three (3) kits per layer and five (5) layers high making a total of fifteen (15) kits per pallet.
>
> Size of banded load will be 53¼" Wide x 40" Long x 56" High (includes pallet). Estimate weight of packaged kits will be 110 lbs. each x 15=1650 lbs. Net Weight plus 90 lbs. for pallet=1740 lbs. Gross Weight.
>
> Hope everything meets your approval and if I can be of further assistance, please call.

Mr. Roe did not answer Mr. Workman's letter but continued his normal work, including preparation of the routing instructions. The testimony in the record and an examination of these routing instructions clearly demonstrate that the information concerning the method of packaging and weights set out in Mr. Workman's letter was used by Mr. Roe's department to prepare the instructions.

On November 16, 1966, defendant issued shipping instructions for the purchase order of the 10,513 kits. These instructions listed a unit price of $91.44 and a freight classification of "AXLES, AUTOMOBILE W/EXTERNAL ATTACHMENTS IN PKGS. AND/OR SKIDS" (skids are synonymous with pallets). The instructions set out in general terms the time of delivery, and specifically listed the destinations and quantities to be delivered thereto. Starting in January 1967, Mr. Roe issued about 269 bills of lading to various transportation companies for hauling the kits from Dana Corporation's shipping point to various post office facilities in the United States. The bills of lading listed essentially the same freight contained on the shipping instructions, and utilized information obtained from defendant regarding method of packaging.

In January 1967, Dana Corporation began shipment of the axles packaged individually and with a varying number of kits per pallet. Invoices for these kits were paid by the Department's Finance Office located in New York City, New York, including the $5.25 charge for packaging as billed. The finance office, sometimes referred to as the Postal Data Center (PDC), was then handling about 10,000 invoices and issuing approximately 1,500 checks during an average 4-week period. After the eighth or ninth payment around April 6, 1967, the finance office discovered that there was not enough money authorized to pay for both the kits and packaging. An employee of the finance office informed Mrs. Georgetta Kelley, a POD Contracting Officer in Washington, D. C., of this fact by telephone, and she stated that payment should not be held up for fear that this would jeopardize delivery of the equipment. The PDC continued to pay the invoices, including the $5.25 packaging charge, until June 8, 1967, when it began withholding payment. A total of 6,871 units had been paid for as of said date. Plaintiff was not notified of the decision to disallow the packaging charge until July 19, 1967, when the finance office informed plaintiff that they were deducting from payments due under the unpaid invoices, the sum paid for packaging expense un-

der the previously paid invoices. At this time, approximately 10,000 units had been shipped. The remainder were also shipped in individual cartons. The $5.25 packaging charge was invoiced for the entire 10,513 kits.

Fred I. Alexovich (incorrectly spelled in the Board opinion as Alexovitch), a POD inspector, visited plaintiff's plant in Fort Wayne, Indiana, on October 14 and December 9, 1966, and again in January and February 1967. The visits prior to January were mainly for the purpose of examining the adequacy of plaintiff's quality control procedures. During the October visit, Mr. Alexovich had a talk with Gordon Boone, a sales executive employed by plaintiff, who was involved in the making of the contract in the instant case and announced that he was in charge of, and responsible for, the contract. Mr. Alexovich told Mr. Boone that he did not have a copy of the contract and would like, to see one. Mr. Boone then furnished Mr. Alexovich with three pages of the contract, not including supplemental page 2C (the notice to successful contractor, mentioned earlier). In the course of the visit in December, Mr. Boone asked Mr. Alexovich to view the packaging which Mr. Workman planned to use. Mr. Alexovich accompanied Mr. Boone to Mr. Workman's office where he (Alexovich) viewed the planned individual package for the axle and parts. When asked by Mr. Boone what he thought of the package, Mr. Alexovich stated that it looked "pretty good." The visits Mr. Alexovich made in January and February 1967 were for the purpose of inspecting· the axles and large parts. During these inspections, cartons were selected at random, opened, and the contents checked for both quantity and quality. Mr. Kappes, a local inspector for the POD who assisted Mr. Alexovich on occasion, made visits to Dana's plant from time to time and made inspections of items ready for shipment. In a few instances Mr. Kappes observed that a box or carton was damaged and he brought the situation to plaintiff's attention.

In September 1967, plaintiff's Mr. Boone had a meeting with the Department's Contracting Officer, Mr. Itnyre, and several postal employees in Washington, D. C. During this meeting, Mr. Boone admitted that he had made a mistake with respect to the packaging requirements, which embarrassed him, and he stated that he would appreciate whatever the Department could do to give some relief. Also under date of September 8, 1967, Richardson A. Farley, plaintiff's staff attorney, sent a letter to the Department's Contracting Officer, requesting payment for the additional shipping charges claimed herein on the basis that the original contract provision relating to bag shipment had been modified "through a course of performance initiated by Dana and approved both in writing and action by Post Office personnel." This letter also stated that the use of individual packaging, as compared with bag packaging, was arrived at after entrance into the contract and "when it was determined by our personnel that bag packaging was unsatisfactory."

After consideration of Mr. Farley's September 8, 1967 letter, the Contracting Officer denied any liability for the additional charge of $5.25 claimed by plaintiff for individual packaging. However, in a letter sent to plaintiff under date of January 15, 1968, the Contracting Officer offered a settlement of $3,037.50. The settlement sum proposed represented payment of $4.50 [4] each for 675 kits which the Contracting Officer concluded could not reasonably be shipped in the five to a pallet or multiple thereof, as set up in the contract. In a letter to the Contracting Officer dated February 26, 1968, Mr. Farley advised that after "thorough management review" of

---

4. The $4.50 is the charge proposed in plaintiff's June 21, 1966 letter, which was incorporated into the contract, for individually packaged kits.

the proposed settlement, plaintiff considered it unacceptable.

Thereafter, on March 13, 1968, the Contracting Officer (Mr. Itnyre) issued a final decision denying plaintiff's claim to entitlement of a $5.25 packaging charge on each unit shipped, and again offered an additional settlement payment of $3,037.50. Plaintiff timely appealed from that decision to the Board and upon its denial of plaintiff's claim, the latter instituted the present action.

The threshold issue presented here is whether the kits could have been shipped on a pallet with loose parts in a bag attached to the axle. It is determinative of the law to be applied and basic to all the discussion herein.

As noted, due to the configuration of the vehicle and axle, and the installation procedures finally developed, many of the items were not to be attached to the axle, including coil springs, brackets, brake line, nuts, bolts, etc. Item 17920 of the National Motor Freight Classification (hereinafter NMFC), which governed the shipment of the goods in question, stated "Axles, automobile or trailer, with external or internal attachments or movable parts: Loose * * * In packages or on skids * * *." Both parties agree that this permitted shipment of axles either loose, packaged, or on skids. The question is whether the definition of "attachments" included the above parts.

Dean Brown, Division Traffic Manager for Dana Corporation, testified that he interpreted the word "attachment" in the above quote to include only those items physically attached to the axle at the time of shipping, and that the other loose items listed above had to be packaged in accordance with the pertinent sections of the NMFC covering the particular part. He cited Item 177800 which required coiled wire springs to be boxed or crated. In addition, Mr. Brown stated that the brake line which was a small-diameter piece of malleable copper tubing, had higher packaging standards than the axle. Item 51900

stated "Pipe or Tubing, brass, bronze or copper, NOI, loose (LTL [less than truckload], only if weighing each 50 pounds or over), or in packages." Rule 680 of the NMFC provided that the carrier could refuse to accept freight if it was not reasonably packaged to protect it against damage, and Mr. Workman had previously testified that safe shipment of the tubing could not be guaranteed if packaged in a bag, since the larger parts in the bag could shift and damage the easily bent tubing.

Mr. Brown further testified that if the items comprising the kit were to be packaged together, they would have to be packaged in accordance with the highest standard required for any one of the articles in the kit. In this case, he concluded that the entire kit would have to be boxed to meet the higher standards for the spring, brake line, and brackets (no NMFC for this item). He further stated that if the final design had called for the three items to be physically attached to the axle by welding or other comparable method, the kits could have been shipped unboxed on a pallet with the loose parts in a bag attached to the axle.

Mr. Roe, the POD's traffic man, testified that parts and pieces to make a completed article are considered part of the item and have the same rating (packaging requirements) as the article itself. He interpreted "axles with external attachments" to be the axle and all other parts making up the completed article including in this case, among other things, the springs, brake line, and brackets. He stated that it was allowable to ship the axle with loose parts in a bag fastened to the axle and that in fact it was done every day. In support of his interpretation, Mr. Roe cited Rule 424 which provided "Parts or pieces constituting a complete article, received on one bill of lading, will be charged for at the class provided for the complete article. * * *" As to the brake line, Mr. Roe stated that if it was properly bagged, it would probably escape damage.

In Comment number 3 [5] contained in its opinion, the Board stated, at p. 38,141, in part:

The Board has noted the testimony of witness Brown, a traffic employee for Appellant. While the Board considers Mr. Brown's view on the applicability of freight classification his good faith opinion, the Board considers the opinion of the Department's Mr. Roe consistent with the applicable motor freight classification schedule and as representing Mr. Roe's good faith opinion.

Comment 12, at 38,142–43, of the Board's opinion reads:

There is no persuasive evidence in the record that after June 30, 1966, the configuration of the axle retrofit kit was changed so as to create any packaging problem of consequence necessitating, in whole or in part, the $55,000 additional charges Appellant attempted to collect and now claims.

■ From a careful review of the cited NMFC sections, certain other explanatory materials contained therein, and the testimony of the transportation expert witnesses [6] of both parties, it can only be concluded that both plaintiff's and defendant's interpretations of the NMFC requirements were reasonable. Without further evidence,[7] it cannot be determined whether the plaintiff could have actually shipped the axles in the unboxed state. The issue is, however, an affirmative part of plaintiff's claim, placing the burden of proof on plaintiff which it has failed to sustain.

■ The basic issue hereinafter is the interpretation of the contract provisions and documents. This court has consistently held that the interpretation of a contract involves a question of law and the Board's decision is not entitled to finality under the standards prescribed by the Wunderlich Act, *supra*. Tri-Cor, Inc. v. United States, 458 F.2d 112, 122, 198 Ct.Cl. —— (1972); Max Drill, Inc. v. United States, 427 F.2d 1233, 1237, 192 Ct.Cl. 608, 614 (1970). Accordingly the court is free to reexamine the contract language and independently reach its own conclusion.

■■ Plaintiff's proposal, consisting of three prices for different methods of packaging, was made in light of its above interpretation of the transportation regulations that the kits could not be shipped loose unless the coil springs, brake line, and brackets were physically attached to the axle, which decision had not been made at the time the quotation was submitted. Plaintiff undoubtedly did not intend to offer the POD a choice between the three prices. However, subjective intent is not important and the proposal must be viewed from an objective standpoint.[8] Considering that plaintiff has failed to prove that the method of packaging was dependent upon the outcome of the final design and development of the installation procedures or that defendant so believed, the POD's interpretation that the proposal offered it a choice between three alternative methods and corresponding prices was not only a reasonable interpretation but probably the only reasonable one. This is particularly true since defendant was responsible for damage in transit.[9]

---

5. The Board separated its opinion into three basic sections, namely: Findings of Fact, Conclusions of Law, and Comments. In explaining the Comments which follow the Findings and Conclusions, the opinion, at p. 38, 141 states, "[t]he Board considers the foregoing an adequate statement of the basis for the Board's decision. But, in addition, the Board includes the following comments as part of this opinion."

6. These witnesses were experts to the extent that both dealt with the NMFC and were involved in shipment of goods as part of their daily work.

7. It would appear that the better evidence would have been the carrier's interpretation and a statement as to its normal practice.

8. *Cf.* Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551, 195 Ct. Cl. 21, 30 (1971).

9. The only item which plaintiff showed was susceptible to damage to any unusual extent, if shipped loose, was the brake line.

■ Defendant's letter of contract award and notice to proceed dated June 30, 1966, was a valid acceptance of plaintiff's offer. Although said letter contemplated a formal document to be drawn up in the future, it expressed an intent to be presently bound. Under these circumstances, the contract became effective immediately. Penn-Ohio Steel Corp. v. United States, 354 F.2d 254, 266–267, 173 Ct.Cl. 1064, 1085 (1965); Rough Diamond Co. v. United States, 351 F.2d 636, 645 & n. 13, 173 Ct.Cl. 15, 31 & n. 13 (1965), cert. denied, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966); Hunt and Willett, Inc. v. United States, 351 F.2d 980, 986, 168 Ct.Cl. 256, 266 (1964); Restatement of Contracts § 26 (1932).[10] The POD's letter did not state that it was accepting any particular one of the alternatives set forth in plaintiff's proposal but it did state the total contract price, which was mathematically equivalent to the contract quantity specified in the RFQ times the price for the kit shipped loose, plus tax. The contract at this point might be considered ambiguous. However, the formal contract mailed shortly thereafter and contemplated by the letter included page 2C, which stated "[a]ccepting standard commercial pack of 5 axles per pallet, and loose parts in a bag attached to the axle."

Plaintiff first contends that supplemental page 2C is not part of the contract between the two parties. It essentially says that the formal contract must conform to the RFQ, proposal and notice of award; that page 2C alters the agreement of the parties as contained in these documents; and that plaintiff, not having mutually assented to this change, should not be bound thereby.

■ Where a final formal document has been executed, this court has said that all previous negotiations, documents, etc., are merged therein and the document "must be deemed conclusive as to the contractual arrangement extant between the parties, in derogation of any prior commitments the substance of which it embodies." Willems Industries, Inc. v. United States, 295 F.2d 822, 827, 155 Ct.Cl. 360, 369 (1961), cert. denied, 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962). *Accord,* Schoeffel v. United States, 193 Ct.Cl. 923, 934 (1971); Oklahoma v. United States, 173 F.Supp. 349, 355, 146 Ct.Cl. 185, 196 (1959). On the other hand, the special nature of Government contracting has been recognized and it has been held that merger cannot be strictly applied thereto. The courts have stated that the advertisement, bid, and acceptance constitute the real contract, and that the instrument is merely a reduction to form. Harvey v. United States, 105 U.S. 671, 688–689, 26 L.Ed. 1206 (1881). *See* G. Schwartz & Co. v. United States, 89 Ct.Cl. 82, 91 (1939); Pfotzer v. United States, 77 F. Supp. 390, 393, 111 Ct.Cl. 184, 215, cert. denied, 335 U.S. 885, 69 S.Ct. 237, 93 L. Ed. 424 (1948). Here the formal contract document, including page 2C, did not change the original contract, as constituted by the RFQ, the proposal with attached letter, and notice of award, but simply clarified the terms of the acceptance. In such a situation, the formal contract must be considered the embodiment of the terms of the contract, if not objected to by the other party. Plaintiff did not express any objection to defendant's inclusion of page 2C in the contract documents.

Plaintiff also contends that the actions of the parties in performing the contract should be looked at to determine if page 2C was part of the contract. Page 2C was a physical and integral portion of the formal contract document mailed to plaintiff, and it made no objection thereto. The parties' subse-

---

However, testimony indicates that replacement copper tubing, which constituted the brake line, was readily available and inexpensive (about $0.35 total). There was also testimony that the brake line could have been protected by proper bagging or by taping it to the axle.

10. *But see* Holmberg v. United States, 91 Ct.Cl. 501, 509 (1940).

quent performance, while important for many reasons, will not alter this fact.

■ Now turning to plaintiff's other contention that even if page 2C is contractually binding, its unilateral addition to the contract documents created an ambiguity which the parties resolved by their subsequent conduct. Any group of words can be twisted by strained construction into an ambiguity, but this should not be done. Aero Mayflower Transit Co. v. United States, 162 Ct.Cl. 233, 237 (1963). Where a contract is amenable to only one reasonable construction, it should be enforced according to its tenor as a whole. Plaintiff's interpretation must be within a "zone of reasonableness." Bishop Engineering Co. v. United States, 180 Ct.Cl. 411, 415–416 (1967).

■ Plaintiff's letter of June 21, 1966, showing three alternative methods of packaging with prices for each, and defendant's notice of award setting out a total price mathematically consistent with plaintiff's quotation for kits shipped loose, when read with the statement on page 2C accepting the kits shipped loose, are susceptible to only one reasonable interpretation, *i. e.*, that there was no requirement to package the kits in boxes. No substantial ambiguity exists and the contract must be given its plain meaning.

Even unambiguous words cannot be interpreted in a vacuum and plaintiff asserts that when viewed in light of the fact that the method of packaging was dependent on the final configuration of the kit, the language becomes ambiguous. However, as previously noted, plaintiff has failed to sustain its burden of proof as to this point.

■ The fact that plaintiff obviously interpreted the contract to require boxing does not necessarily prove that an ambiguity exists. As stated in *Bishop Engineering Co., supra:*

    * * * Nor is a contract rendered ambiguous by the mere fact that the parties disagree as to its meaning when the disagreement is not based on

reasonable uncertainty of the meaning of the language used. Carter Oil Company v. McCasland, et al., 190 F. 2d 887, 890–91 (10th Cir. 1951), cert. denied, 342 U.S. 870 [72 S.Ct. 113, 96 L.Ed. 654]. The fact that an improvident interpretation placed by a contractor upon the specifications may even be considered conceivable, is not a sufficient basis alone for construction of the contract against the author of the language, if not reasonable when the contract is considered as a whole and in light of the purpose of the contract. Randolph Engineering Company v. United States, 176 Ct.Cl. 872, 367 F.2d 425 (1966); Southern Construction Company v. United States, 176 Ct.Cl. 1339, 364 F.2d 439 (1966); Jefferson Construction Company v. United States, 151 Ct.Cl. 75, 84 (1960). [180 Ct.Cl. at 416.]

Even assuming, *arguendo*, that the language of the contract documents is somewhat ambiguous, the parties' subsequent conduct before the present controversy arose is of little value, since it shows no more than a mutual misunderstanding of the contract provisions and, although the intention of one of the parties may have been different from that expressed in the contract, the court should give the words their usual and ordinary meaning. Hotpoint Co. v. United States, 117 F.Supp. 572, 574, 127 Ct.Cl. 402, 406, cert. denied, 348 U.S. 820, 75 S.Ct. 32, 99 L.Ed. 647 (1954).

■ Plaintiff points most strongly to the fact that it shipped the axles in boxes, billed defendant on this basis, and was paid therefor. The weight to be given payment by the PDC is directly covered by Deloro Smelting and Refining Co. v. United States, 317 F.2d 382, 161 Ct.Cl. 489 (1963), although plaintiff unsuccessfully attempts to distinguish the fact situations in that and the instant case. In *Deloro* payment for cobalt metal was to be made at the market price "as of the date of delivery." Deloro delivered the ore after the date required by the contract and was paid at the market price at that time. The

court interpreted the words "date of delivery" to mean "date of due delivery." It stated that little significance could be given to the course of payments by defendant, since they were routinely made by employees not significantly tied to the administration of contract performance. In this connection, the court said:

 \* \* \* When the canon of construction speaks of giving weight to the "parties'" own interpretation, it refers, so far as the Government is concerned, to a responsible officer assigned the function of overseeing the essentials of contract performance— not to any federal employee or officer whose work happens to be connected with the contract. [317 F.2d at 385–386, 161 Ct.Cl. at 494.]

In the instant case, the PDC was a large-volume disbursing office whose function was not related to contract administration, and the fact that it was billed and paid the additional amount claimed by plaintiff is not considered significant.

■ Comment 4 of the Board's opinion, at p. 38,141, reads in pertinent part:

 Although by February 1967, a Contracting Officer for the Department was chargeable with knowledge that shipments were being made by Appellant in individual cartons on pallets, the real question is whether or not this created any obligation on the part of the Department to pay $5.25 per unit for such packaging. The Board has concluded that there was no such obligation. The conclusion is largely based on the finding that this kind of packaging was the result of a unilateral judgment made and action taken by Appellant's personnel and not authorized by Department's contract with Appellant or necessitated by any subsequent conduct of any Department employee.

Even though the method of packaging utilized was in excess of the contract requirements, as the Contracting Officer understood them, it placed him under no obligation to object.[11] His failure to do so indicates only that boxing, as proposed by plaintiff, was acceptable and not necessarily that he interpreted the contract to require boxing. Certainly, it does not show that the Contracting Officer, without knowledge of the amount being charged by and paid to plaintiff, interpreted the contract to provide additional compensation for the boxing.

■ In addition, Plaintiff notes that Mr. Alexovich and Mr. Kappes inspected and approved the packaging, and that employees of the transportation section of the POD utilized information regarding packaging in boxes furnished by plaintiff in preparing the routing orders and bills of lading. Again, these were not responsible parties connected with the administration of the contract and their actions indicated only that boxing as proposed by plaintiff was acceptable. The above is not sufficient to show a contemporaneous interpretation by the Government, so as to construe the contract language other than in accordance with the plain meaning of the words contained therein.

As stated previously herein, the evidence clearly indicates and the Board so found in its comments, that about April 6, 1967, when approximately 3,000 kits [12] had been delivered, an employee of the PDC, upon discovering that there was not sufficient funds authorized to pay the base price and the packaging charge, so notified Mrs. Kelley, a POD Contracting Officer. However, she directed the finance office to continue paying both prices for fear that delivery of the equipment might otherwise be jeopardized. It is significant to note that the contractor was not informed of the problem until July 19, 1967, after approxi-

---

11. *See* Tecon Corp. v. United States, 411 F.2d 1262, 1267, 188 Ct.Cl. 15, 24 (1969).

12. This figure was taken from the Material Inspection and Shipping Reports introduced in evidence at the hearing before the Board on plaintiff's appeal.

mately 10,000 kits had been delivered. In explaining the weight given these events, the Board, in Comment number 8, at p. 38,142, stated in part:

    \* \* \* It is surely part of the job of a Contracting Officer not to jeopardize unnecessarily deliveries needed urgently on essential equipment. The exercise of reasonable discretion by a Contracting Officer in doing that part of the job, does not of itself create a Department obligation to pay without subsequent correction improper billings made by a contractor.

    ■■■ It has been held that the Government is estopped from denying the actions of its agents within the scope of their authority and which are relied upon by others to their detriment. *See* Pacific Far East Line, Inc. v. United States, 394 F.2d 990, 1003, 184 Ct.Cl. 169, 194 (1968); George H. Whike Constr. Co. v. United States, 140 F. Supp. 560, 563–564, 135 Ct.Cl. 126, 131 (1956); United States v. Certain Parcels of Land, 131 F.Supp. 65, 74–76 (D. C.S.D.Cal.1955). Here the Contracting Officer (Mrs. Kelley) knew that the plaintiff was performing in excess of the contract requirements and expected to be paid therefor. By continuing payment and not informing plaintiff of the problem, Mrs. Kelley could have induced and encouraged plaintiff to ship the kits in boxes. *See Tecon Corp.,* n. 11 *supra.* It is possible that, if plaintiff had been informed of the problem, it could have packaged the remainder of the kits on pallets with loose parts in a bag and still have maintained an action under the disputes clause for additional costs on the same basis as it does herein.

    Mrs. Kelley testified that she occupied the dual capacity of Contract Administrator and Contracting Officer on this job. She stated that her authority extended to change orders not exceeding $10,000, and interpretations of the contract insofar as it was not a substantial interpretation. She worked directly for Mr. Itnyre, Chief of the Contract Branch and the party who signed the original contract as Contracting Officer. Mrs. Kelley's decision to continue payment without informing plaintiff of the problem was within the scope of her authority [13] and the Government is estopped from denying the effects thereof.

    ■■■ However, another essential element of estoppel is detrimental reliance. *Williamsburg Drapery Co., supra,* 369 F.2d at 736, 177 Ct.Cl. at 789. The problem in this case is that the court cannot determine, on the basis of the present record, whether plaintiff relied to its detriment on the defendant's continuing to pay the packaging charge, and the Board did not pass upon this issue. As has been indicated, it is quite possible that, had plaintiff been notified of the problem, it could and would have altered its performance to mitigate damages, and this would be sufficient to constitute detrimental reliance. *See* Mahoning Investment Co. v. United States, 3 F.Supp. 622, 630–631, 78 Ct.Cl. 231, 247–250 (1933), cert. denied, 291 U.S. 675, 54 S.Ct. 526, 78 L.Ed. 1064 (1934). Defendant disagrees and urges that plaintiff would have continued to package as before. The record is unclear and scanty on these points. These are therefore matters for further proof in the administrative process and for evaluation by the administrative authorities, and the case must be sent back for that purpose. If detrimental reliance is found, defendant's action effectively resulted in a constructive change of the packaging provisions, and plaintiff would be entitled to an equitable adjustment.

    Such an equitable adjustment, if allowable, would cover the excess packaging costs of the kits packaged between April 6, 1967 and July 19, 1967, when the Government issued its deduction notice. The administrative authorities, if the parties cannot agree, will have to determine the proper amount for such an equitable adjustment (if it is found that

---

13. The Board essentially agreed, stating in Comment 8 of its opinion, that the acts were within the Contracting Officer's discretion.

an equitable adjustment should be made).

The result is that plaintiff must assume the responsibility for excess packaging costs of the kits packaged prior to April 6, 1967, but may be entitled to an equitable adjustment with respect to the kits packaged between April 6, 1967, and July 19, 1967, depending on the proof and the findings in the further administrative proceedings.

### CONCLUSION

Accordingly, defendant's motion for summary judgment is granted and plaintiff's motion is denied with respect to the kits packaged prior to April 6, 1967. With respect to the later period, further proceedings in this court are stayed pursuant to Rule 167[14] for a period of six months to afford the parties an opportunity to obtain administrative resolution of the issues specified in this opinion.[15]

60 CCPA

---

14. *See* Macke Co. v. United States, 467 F.2d 1323, 199 Ct.Cl. ——, —— (1972).

15. Defendant's motion to strike a portion of plaintiff's opposition to defendant's request for review is denied.