**SUWANNEE RIVER FINANCE, INC.,**
**et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 652–83C.**

United States Claims Court.

March 26, 1985.

Joseph A. Artabane, Washington, D.C., with whom were H. Clayton Cook, Jr., James A. Rossi, Jerome A. Madden and Cadwalader, Wickersham & Taft, for plaintiffs.

Joseph T. Casey, Jr., Washington, D.C., with whom were Acting Asst. Atty. Gen. Richard K. Willard, David M. Cohen and Sandra P. Spooner, for defendant; James F. Ford, Dept. of Transportation, of counsel.

## OPINION

KOZINSKI, Chief Judge.

Plaintiffs sue for construction-differential subsidy payments[1] in the amount of $1,339,682 for changes made in the construction of three ships. The Maritime Administration (MarAd) denied such payments pursuant to a directive that stopped all subsidies for non-essential changes.

### Facts

The Merchant Marine Act of 1936, 46 U.S.C. §§ 1101–1295g (1982), was enacted to foster the development of the merchant marine and ship construction industry. Pursuant to the Act, MarAd is responsible for maintaining a large, well-equipped and efficient domestic merchant fleet. *See generally Newport News Shipbuilding & Dry Dock Co. v. United States*, 7 Cl.Ct. 549, 551–52 (1985). MarAd's task is hampered by the fact that it is cheaper to build, equip and man ships in foreign ports. Companies engaged in shipping therefore find it more advantageous to use a foreign-flag rather than a domestic merchant fleet. In response, MarAd has provided various subsidies for the construction and operation of merchant vessels built in American shipyards. The subsidies are intended to achieve parity between domestic and foreign costs of construction and operation. One such subsidy is the construction-differential subsidy (CDS) program which provides subsidies for the construction of vessels in domestic shipyards.

Occidental Petroleum, plaintiffs' parent, entered into a project calling for the mining, sale and transportation of superphosphoric acid to the Soviet Union. In 1977, Occidental began negotiating for the construction of the ships it would need to deliver the acid. Occidental considered building the ships in Japan but decided on domestic construction on the basis of a proposal from MarAd to provide a subsidy package consisting of CDS and other incentive financing.

In June of 1978, plaintiffs entered into contracts with Avondale Shipyards for the construction of three ships at an approximate cost of $50 million each. The contracts were submitted to MarAd for final approval. Before granting this approval, MarAd officials altered the language of the changes clause in each of the contracts. The new language required plaintiffs to commit themselves financially to any changes before submitting them to MarAd for subsidy consideration.

Plaintiffs executed the contracts with Avondale subject to the changes required by MarAd. Plaintiffs then signed contracts with MarAd calling for subsidies of approximately $25 million per vessel. Article 3 of the subsidy contracts provides that "[u]pon consideration of the Purchaser's request, the Board, in its sole discretion, shall approve or disapprove the request for subsidy participation in the change unless the change involved is an Essential Change."[2]

During the following three years, plaintiffs authorized and MarAd approved various essential and non-essential[3] changes in the construction of the ships. On December 30, 1981, however, in light of a severely reduced budget, the Maritime Administrator halted all subsidy payments for non-es-

---

**1.** Construction-differential subsidy payments are authorized by Subchapter V of the Merchant Marine Act of 1936, 46 U.S.C. §§ 1151–61 (1982).

**2.** Article 1 of the contracts defines essential changes as "changes in the Contract Work due to an action of a Regulatory Agency or changes in law ... or changes necessary to remedy a

Substantial Design Defect." Essential changes, once so qualified, are entitled to subsidy. No essential changes are in issue here.

**3.** Article 1 of the contracts defines non-essential changes as "all changes in the Contract Work which are not Essential Changes."

sential changes. Plaintiffs were notified of the administrator's decision by letter dated January 4, 1982, from the secretary of the Maritime Subsidy Board. At the time of the notification, plaintiffs had submitted for subsidy approval non-essential changes in the amount of $1,339,682. Plaintiffs were denied subsidies for all of these changes pursuant to the December 30, 1981, order. They petitioned the agency for reconsideration of that decision; MarAd denied the petition on May 20, 1983.

### Issues Presented

Plaintiffs first suggest that the contract, by its terms, precludes defendant from denying subsidies for non-essential changes. Specifically, plaintiffs argue that the court cannot interpret the contract without the aid of extrinsic evidence and that such extrinsic evidence supports their interpretation. Second, plaintiffs argue that defendant is precluded by the applicable regulation, 46 CFR § 251.1 App. No. 1 (1984),[4] from exercising any discretion it may have under the contract. Third, plaintiffs argue that even if defendant may limit subsidy payments under the contract and the regulation, it is estopped from so doing by a consistent course of dealing during the previous 16 years. Finally, plaintiffs argue that defendant exercised its discretion in an arbitrary and capricious fashion.

Defendant disputes each of these points.

### Discussion

#### A. *The Contract*

The language of the contract could hardly be clearer in defining the scope of MarAd's rights and responsibilities in approving subsidies for contract changes. Paragraph (a) of Article 3 provides that plaintiffs must submit a request for subsidy approval to the Maritime Subsidy Board. Except in the case of essential changes, the contract then provides that "the Board, in its sole discretion, shall approve or disapprove the request for subsidy participation." Even in those cases where the

Board approves such participation, it need not participate fully but, "in its sole discretion, shall determine the amount of the Board's subsidy participation in the change."

The only plausible interpretation of this provision is that, as to non-essential changes (the kind here in issue), the Board has discretion to approve subsidies in full, in part, or not at all. This view is supported by the very next paragraph of the contract which begins with the phrase, "[i]n the event that the Board approves the subsidization of any change." This language clearly allows for the possibility that the Board might deny such participation in some cases.

Plaintiffs suggest that this language cannot be taken at face value but must be interpreted in light of the facts and circumstances as they existed at the time the contract was signed. In support of their position plaintiffs have offered the affidavits of persons who conducted the negotiations with MarAd on behalf of Occidental. These affidavits state that MarAd officials had assured Occidental's negotiators that the Board would approve all non-essential changes as a matter of course. Plaintiffs argue that there is a factual dispute on this issue and that the matter therefore cannot be resolved in defendant's favor by summary judgment.

 The court rejects plaintiffs' argument for two reasons. First, none of the persons who allegedly gave plaintiffs assurances as to what action the Board would take had authority to so bind defendant. The contract was signed on behalf of MarAd by Robert J. Blackwell, Assistant Secretary of Commerce for Maritime Affairs and Chairman of the Maritime Subsidy Board. The statements plaintiffs cite in support of their position were not attributed to Mr. Blackwell or to anyone else with the authority to bind the Board. It is well estab-

---

4. The regulation was promulgated on September 9, 1965, by the Maritime Subsidy Board under authority from the Department of Commerce and the Maritime Administration. Primary authority for the regulation now resides virtually unchanged in the Department of Transportation. *See* 46 U.S.C. § 1114(a) (1982).

lished that the United States cannot be bound by the statements of its unauthorized agents, *e.g., Holloway Construction Co. v. United States,* 4 Cl.Ct. 779, 788 (1984); *Yosemite Park & Curry Co. v. United States,* 582 F.2d 552, 217 Ct.Cl. 360, 370 (1978), and that only officials having contracting authority may bind the United States to a contract. *E.g., Jackson v. United States,* 573 F.2d 1189, 216 Ct.Cl. 25, 41 & 43 (1978); *Emeco Industries, Inc. v. United States,* 485 F.2d 652, 202 Ct.Cl. 1006, 1015 (1973). It follows a fortiori that persons who are not authorized to contract on behalf of the United States cannot bind it to a particular contract interpretation on the basis of oral statements or representations they make at the time the contract is signed.

■ In any case, the evidence proffered by plaintiffs is barred by the Parol Evidence Rule. The contract in question is a lengthy and detailed written document, plainly intended to contain the full agreement between the parties. Parol evidence is not admissible to vary its terms. Here, the proffered evidence would do more than vary the terms of the contract; it would, in effect, nullify those provisions giving the Board discretion to deny, in whole or in part, subsidies for non-essential changes. Even where parol evidence is admissible, it cannot be used to entirely nullify a contract term, as plaintiffs would have the court do in this case. *Bishop Engineering Co. v. United States,* 180 Ct.Cl. 411, 416 (1967); *accord Dana Corp. v. United States,* 470 F.2d 1032, 200 Ct.Cl. 200, 216 (1972).

In sum, this is a detailed contract, involving great sums of money and negotiated by parties dealing from a position of mutual strength and at arms' length. The terms to which the parties agreed are clear and unambiguous. There is no legitimate reason to interpret those terms other than as they are written in the contract.

### B. *The Regulation*

The parties agree that, whatever the Board's authority under the contract, its discretion may be limited by regulation.

Plaintiffs argue that such a limitation is contained in paragraph (2) of 46 C.F.R. § 251.1 App. No. 1 (1984), which provides that subsidies will be allowed "only if ... it can be demonstrated with reasonable certainty that the added investment will produce a return to the owner of at least 10 percent per annum after taxes over the life of the investment." Plaintiffs argue that their proposed changes meet this standard and that they are therefore entitled to payment.

■ The regulation does not support plaintiffs' position. The language providing that subsidies will be allowed "only if" certain restrictions are met clearly sets a standard of eligibility for, not entitlement to, a subsidy. By its terms, the regulation merely delineates the minimum standards an applicant must meet before the Board may act. Nothing in the regulation even remotely suggests that all those who are eligible will, as a matter of course, be entitled to subsidy payments. Indeed, paragraph 4 of the same regulation reiterates this concept of eligibility by providing that "[s]ubsidy for changes under the construction contract will be allowed *only* when" the conditions of paragraph (2) are met. (Emphasis added.) Plaintiffs' interpretation would require the court to ignore the term "only" in this phrase since that term will be rendered superfluous if the regulation is read as establishing an entitlement to a subsidy rather than mere eligibility.

■ It is axiomatic that regulations must be interpreted to give meaning to every word, particularly where doing so leads to an entirely sensible interpretation of the provision in question. The court therefore concludes that the regulation on which plaintiffs rely does not support their position. The regulation narrows the Board's discretion only by limiting the types of changes it may consider for subsidy. It does not entitle plaintiffs to a subsidy if they meet the eligibility standards, but leaves the matter within the discretion of the Board. Here, the Board exercised its discretion by denying the subsidy in its entirety.

### C. *Estoppel*

Plaintiffs argue that defendant is estopped from maintaining that section 251.1 of the regulation does not entitle them to a subsidy because of MarAd's contrary interpretation of the regulation during the previous 16 years. Even assuming the correctness of plaintiff's factual premise, the court rejects plaintiffs' argument because estoppel will not operate against the government in this context. Equitable estoppel is a doctrine arising out of the law of contracts; even there it operates against the United States only in very limited circumstances. *E.g., Dana Corp. v. United States,* 470 F.2d 1032, 200 Ct.Cl. at 220–21. The court is aware of no case where the doctrine of equitable estoppel has foreclosed the United States from changing the interpretation it would give a statutory or regulatory provision. Indeed, the government is frequently known to do so. *See, e.g., Viereck v. United States,* 3 Cl.Ct. 745, 760–61 (1983); *Garvey, Inc. v. United States,* 1 Cl.Ct. 108, 118–19 (1983), *aff'd,* 726 F.2d 1569 (Fed.Cir.1984).

In any case, plaintiffs' argument is not supported by the record. Plaintiffs point to a portion of the parties' stipulation providing that "[f]rom the time Section 251.1 was published in the Federal Register on September 15, 1965, until the December 30 Action, the Board determined eligibility for [subsidy] participation ... for changes to contract work in accordance with [its provisions]." Plaintiffs argue that this stipulation demonstrates that MarAd relied upon the standards of section 251.1 to determine entitlement for subsidy participation. However, the stipulation no more supports their argument than does the regulation itself. The stipulation merely documents the self-evident proposition that MarAd followed its own regulation in determining who would be eligible for subsidy participation. The stipulation does not provide, as plaintiffs argue, that all those who were eligible for subsidy were also automatically entitled to it.

### D. *Abuse of Discretion*

Plaintiffs' final argument is that the Board abused its discretion by cutting off all subsidies for non-essential changes after December 30, 1981. The court disagrees. MarAd's action was taken in response to a sudden decrease in its budget. After this budget cut, MarAd obviously could no longer be as generous in paying subsidies as it had been before. To what extent applicants for subsidy payments may be required to share this burden must be left to the discretion of the agency which, after all, is more familiar with the relevant considerations than is the court. The court simply notes that a temporal approach—where subsidies not approved by a certain date are denied—is a logical, effective and time-honored method for allocating the burdens of shrinking resources. It is certainly an approach well within the discretion of the agency charged with the expenditure of these funds.

### Conclusion

Plaintiffs' motion for summary judgment is denied. Defendant's motion for summary judgment is granted. The clerk is directed to dismiss the complaint with costs to the prevailing party.